(October 29, 2015)

K-BAY PLAZA, LLC, Respondent-Appellant, v KMART CORPORATION, Appellant-Respondent. [19 NYS3d 32]—

Order, Supreme Court, New York County (Shlomo S. Hagler, J.), entered February 5, 2014, which, to the extent appealed from, denied so much of defendant's motion for summary judgment as sought dismissal of the causes of action for breach of contract, account stated, declaratory relief and attorney's fees, declined to search the record and grant plaintiff summary judgment on those claims, and denied plaintiff's motion to amend to assert a cause of action for fraud, unanimously modified, on the law, to the extent of granting defendant's motion, and

otherwise affirmed, without costs. The Clerk is directed to enter judgment dismissing the complaint.

Under a lease dated as of November 18, 1993, the predecessor-in-interest of plaintiff K-Bay Plaza, LLC (Landlord) agreed to lease space in the Bay Plaza shopping center in the Bronx to defendant Kmart Corporation (Tenant) for an initial term of 25 years, followed by renewal periods totaling approximately another 24 years. The parties subsequently agreed that the term of the lease would commence on November 14, 1994.

When the lease was executed, the building Tenant was to occupy had not yet been built, and the precise number of square feet of the demised premises was not known. The lease's article captioned "Annual Minimum Rental" provides as follows: "It is anticipated that the Initial Square Footage [of the demised premises] shall be 131,780, and all annual rent numbers set forth below are based upon said number (*assuming initial rent of $11.00 per square foot and 10% cumulative increases every five years*). Should the actual Initial Square Footage differ from 131,780 by more than 50 square feet either way, then there shall be an appropriate upward or downward adjustment of all annual rents to conform to the actual Initial Square Footage" (emphasis added).

The foregoing quotation from the lease is followed by illustrations of the annual rental during each five-year increment of the term (hereinafter, the rent illustrations). Notwithstanding the reference to "10% cumulative increases every five years" in the above-quoted italicized parenthetical (hereinafter, the escalation parenthetical), based on the initial square footage assumed in the lease (131,780 square feet), the rent illustrations that follow reflect increases of 50¢ per square foot every fifth year during the initial 25-year term and increases of 10% every fifth year during the renewal periods.[1] Thus, the lease's rent escalation provision is internally inconsistent.

---

1. The rent illustrations do not expressly state the rates of increase on which they are based. For example, the first two rent illustrations read as follows:

"Tenant shall, during the Lease term (including any renewal thereof as set forth in Article 10), from and after the Rent Commencement Date, pay to Landlord, at such place as Landlord shall designate in writing from time to time, annual rental, as follows:

"For the period from and after the Rent Commencement Date through the end of the 5th Lease Year, inclusive, the sum of ONE MILLION FOUR HUNDRED FORTY NINE THOUSAND FIVE HUNDRED EIGHTY DOLLARS ($1,449,580) per annum;

When the first rent escalation went into effect on the fifth anniversary of the commencement of the lease's term, Landlord began sending Tenant rent invoices reflecting an increase of 50¢ per square foot, consistent with the rent illustrations. However, at some point between late 2001 and mid-2003, during the second five-year increment of the term, Landlord began sending Tenant rent invoices reflecting a 10% increase over the rent during the initial five years, consistent with the escalation parenthetical.[2] Notwithstanding the change in billing, Tenant (which affirmed the lease while it was in Chapter 11 bankruptcy from January 2002 to April 2003) continued to pay rent reflecting an increase of 50¢ per square foot. Landlord added the unpaid amounts to Tenant's account but accepted the rental payments without further objection (save for a one-page October 2006 letter sent in response to Tenant's inquiry) until this action was filed.

Landlord commenced this action in April 2009 to recover the alleged cumulative deficiency in Tenant's payment of rent since May 1, 2003, and to obtain a declaration that the lease provides for a 10% increase in rent every five years. It is Landlord's position that, although the parties had agreed (as reflected in the escalation parenthetical and in the documentation of the negotiations) on a 10% increase in rent every five years during the entire term, Tenant (whose counsel drafted the lease) substituted into the execution copy, without alerting Landlord, two pages changing the rent illustrations (but, perhaps by oversight, not the escalation parenthetical) to reflect increases of 50¢ per square foot every five years during the initial term and increases of 10% every five years during renewal terms. Tenant, on the other hand, contends that the parties agreed during the last two months of the negotiations (which extended over more than a year) that rental increases during the initial 25-year term would be reduced from the 10% figure previously settled on to 50¢ per square foot, as reflected in the rent il-

---

"For the 6th through 10th Lease Years, inclusive, the sum of ONE MILLION FIVE HUNDRED FIFTEEN THOUSAND FOUR HUNDRED SEVENTY DOLLARS ($1,515,470) per annum."

Increasing the amount specified for the first five-year period by 10% would yield $1,594,538, not the lesser amount stated in the illustration for the second five-year period.

2. Landlord's billing manager testified that, in the course of conducting an internal review of rental billings for Landlord's various properties in 2001, it was discovered that the rent for which Tenant was being invoiced had been raised by less than 10% at the end of the fifth year, contrary to Landlord's alleged understanding of the lease's escalation provision. Apparently, up to that point, Landlord's staff had been relying on the rent illustrations in preparing the bills, simply proportionately adjusting upward the amounts shown in the rent illustrations to reflect the leasehold's actual square footage.

lustrations in the executed lease. Tenant does not, however, identify any correspondence, drafts or oral communications with particular representatives of Landlord in which this change was discussed.[3]

In the order under review, insofar as challenged on appeal, Supreme Court (1) denied Tenant's motion for summary judgment dismissing Landlord's causes of action for breach of contract, account stated, declaratory relief and attorney's fees; (2) declined to grant Landlord summary judgment upon a search of the record; and (3) denied Landlord's motion to amend the complaint to assert a cause of action for fraud. For the reasons discussed below, we modify to grant Tenant summary judgment dismissing the aforementioned causes of action, and otherwise affirm.

With regard to the breach of contract cause of action, Tenant argues, and Landlord denies, that the claim is barred by the doctrines of voluntary payment (*see Westfall v Chase Lincoln First Bank*, 258 AD2d 299, 300 [1st Dept 1999]) and waiver (*see Madison Ave. Leasehold, LLC v Madison Bentley Assoc. LLC*, 30 AD3d 1, 6 [1st Dept 2006], *affd* 8 NY3d 59 [2006]). In addition, each party argues that its construction of the lease's escalation provision is correct as a matter of law, contending that the ambiguity created by the apparent contradiction between the escalation parenthetical and the rent illustrations is resolved either by the application of the relevant canons of construction, by the parol evidence in the record, or by the parties' course of dealing under the lease. Finally, Tenant argues that the breach of contract claim, although it seeks relief only for alleged underpayments within the six years immediately preceding the filing of the complaint in 2009 (*see* CPLR 213 [2]), is time-barred under this Court's holding in *Goldman Copeland Assoc. v Goodstein Bros. & Co.* (268 AD2d 370, 371 [1st Dept 2000], *lv dismissed* 95 NY2d 825 [2000], 96 NY2d 796 [2001]). As discussed below, Tenant's statute of limitations argument has merit and requires the dismissal of the breach of contract cause of action. We therefore need not reach the other arguments the parties raise concerning this claim.

---

**3.** The change is discussed in a letter dated October 29, 1993, from Frederick Synk, Tenant's "Real Estate Representative," to Bruce Kauderer, Esq., the outside counsel who represented Tenant in the negotiations and drafted the lease. The letter reads in full as follows: "Enclosed are eight (8) leases which have been executed on behalf of [Tenant]. As we discussed, please substitute new pages showing the compromise rental agreement of .50 increases every five (5) years during the base term, and 10% increases during the options. Afterwards, please deliver the documents to the landlord for execution."Landlord contends that Synk, who died before this action was commenced, never had any contact with any of Landlord's representatives.

In *Goldman Copeland*, this Court squarely held that a claim for breach of contract based on an allegedly erroneous computation of rent accrues upon the first use of that computational methodology, and the statute of limitations does not begin to run anew each time the same formula is used. We said in that case: "Since [the allegedly erroneous rent] statements consistently used the same formula in determining the escalation, the tenant's overcharge claim accrued upon its receipt of the first statement almost 12 years before it commenced this action. At that time it had all of the information it needed to contest the manner in which the landlord computed the escalation. The tenant's alternative argument that the yearly increase due under the porter wage escalation clause created a new cause of action each and every year is unpersuasive in the context of a dispute involving a computational methodology that remained constant over the years for which the computation is being challenged" (268 AD2d at 371).

*Goldman Copeland* was followed by the Fourth Department in *Kaufmann's Carousel, Inc. v Carousel Ctr. Co. LP* (87 AD3d 1343, 1345 [4th Dept 2011] [citing *Goldman Copeland* in support of dismissal of a tenant's claim for overpayment of its share of the landlord's payments in lieu of taxes where the landlord "submitted evidence establishing that (the parties) have used 1,238,936 square feet as the denominator in that calculation for more than 12 years and that (the tenant) never objected to the use of that number"], *lv dismissed* 18 NY3d 975 [2012]; *see also Kramer Levin Naftalis & Frankel, LLP v Metropolitan 919 3rd Ave., LLC*, 6 Misc 3d 796, 799-801 [Sup Ct, NY County 2004]). In addition, in *J.C. Penney Corp., Inc. v Carousel Ctr. Co., L.P.* (635 F Supp 2d 126 [ND NY 2008]), the Federal District Court, applying New York law, found itself "bound" by *Goldman Copeland* (*id.* at 132), although it noted that the case's holding is "susceptible to criticism" (*id.*). The *J.C. Penney* court distilled *Goldman Copeland* as holding that a challenge to rent escalation charges is time-barred where "(1) [the complaining party] does not file his complaint within six years after he obtained constructive knowledge of the method of computation and (2) the method of computation at issue was continuously applied during that time period" (*id.*).[4]

*Goldman Copeland* is a precedent of this Court, and we ad-

---

4. The *J.C. Penney* court did not dismiss the claim in that case, however, because it found that an issue of fact existed as to whether the plaintiff had "constructive knowledge" of the method used to compute the rent escalation more than six years before the action was commenced (635 F Supp 2d at 132-133). This Court affirmed the denial of a motion to dismiss a claim for rent overcharges on similar grounds, citing *Goldman Copeland* with a "compare"

here to it as a matter of stare decisis. Its holding applies to this case, as Tenant consistently paid, and Landlord accepted, rent based on two successive 50¢-per-square-foot escalations from 1999 through 2009, when this action was commenced. Further, when the first rent escalation went into effect in late 1999, Landlord could have determined, through the use of simple arithmetic, that the lease's rent illustrations for the initial 25-year term were not based on 10% increases. When Landlord subsequently discovered in 2001 that it had not been billing rent based on a 10% escalation since 1999, the discovery was not based on any information that Landlord had not possessed in 1999. While *Goldman Copeland* concerned a tenant's claim for alleged overcharges, not even Landlord suggests that the holding should not apply equally to a landlord's claims for alleged underpayments.

Landlord's attempts to distinguish *Goldman Copeland* are unavailing. In particular, contrary to Landlord's assertion, the *Goldman Copeland* decision does not base its result on the absence of a no-waiver clause from the lease in that case. In fact, the decision does not even mention whether or not the subject lease contained a no-waiver clause. Thus, the presence of no-waiver clauses in the lease before us does not render *Goldman Copeland* inapposite.[5]

We reject Landlord's contention that an issue exists as to whether Tenant's allegedly deceptive substitution of amended pages into the execution copy of the lease equitably estops it from relying on the statute of limitations. Equitable estoppel defeats an otherwise valid statute of limitations defense only where the party invoking the doctrine has reasonably relied on the deceptive conduct alleged to have given rise to the estoppel (*see Zumpano v Quinn*, 6 NY3d 666, 674 [2006]). Here, the discrepancy between the rent illustrations and the parties' alleged actual agreement on 10% increases throughout the term should have been discovered, in the exercise of reasonable diligence,

signal, in *Rite Aid of N.Y., Inc. v Chalfonte Realty Corp.* (105 AD3d 470, 470 [1st Dept 2013]).

5. Also unavailing is Landlord's reliance on *Arnav Indus., Inc. v Pitari* (82 AD3d 557 [1st Dept 2011], *lv dismissed* 19 NY3d 949 [2012]). Although we held timely the *Arnav* landlord's claims for rent arrears that became due within six years before the commencement of the action (*id.* at 558), *Arnav* was a dispute over whether the absence of a permanent certificate of occupancy relieved the tenant of the obligation to pay any rent at all, not over the methodology by which rent should be computed. In any event, the briefs on which *Arnav* was decided show that neither party brought *Goldman Copeland* to the attention of the panel that heard the appeal. Accordingly, even if *Arnav* could be deemed inconsistent with *Goldman Copeland*, it could not be deemed to overrule the earlier decision.

no later than the end of the fifth year of the term, in late 1999, when the first rent escalation went into effect.

Since the dispute over the escalation provision could have been resolved through a timely breach of contract action, Landlord's cause of action for declaratory relief is time-barred for the same reasons, and to the same extent, as the cause of action for breach of contract (*see Matter of Save the Pine Bush v City of Albany*, 70 NY2d 193, 202 [1987]; *Solnick v Whalen*, 49 NY2d 224, 229-230 [1980]; *Fucile v L.C.R. Dev., Ltd.*, 102 AD3d 915, 916-918 [2d Dept 2013]).

The account stated cause of action is deficient for lack of an agreement regarding the balance due under the lease, given the parties' dispute over the amount to be charged for rent escalations (*see Digital Ctr., S.L. v Apple Indus., Inc.*, 94 AD3d 571, 572-573 [1st Dept 2012]; *see also Sabre Intl. Sec., Ltd. v Vulcan Capital Mgt., Inc.*, 95 AD3d 434, 438 [1st Dept 2012]).

The court correctly denied Landlord's motion to amend the complaint to assert a cause of action for fraud, because the fraud claim is untimely (*see generally MBIA Ins. Corp. v Greystone & Co., Inc.*, 74 AD3d 499, 499 [1st Dept 2010]; CPLR 213 [8]). Indeed, because the claim of fraud is based on Tenant's allegedly undisclosed substitution of pages in the lease just before its execution, the limitations period began to run at the time of the execution of the lease in 1993 (*see Rogal v Wechsler*, 135 AD3d 384, 385 [1st Dept 1987])—more than six years before Landlord sought leave to amend. Further, even if it is assumed that Landlord had no reason to be aware of the alleged fraud in 1993, it could have been discovered, in the exercise of reasonable diligence, by 2001, when Landlord's accountant discovered the discrepancy between the 10% increases to which Landlord believed itself entitled and the previous billings for escalated rent based on the lease's rent illustrations (*cf. Sargiss v Magarelli*, 12 NY3d 527, 532 [2009]). The discovery of this discrepancy in 2001 placed Landlord on inquiry notice of the alleged fraud long before the 1993 letter from Synk to Kauderer (described in footnote 3 above) was produced in this action. Accordingly, the proposed fraud claim, whether deemed to have been interposed when Landlord moved to amend the complaint in 2013 or to relate back to the commencement of this action in 2009, is time-barred.

Landlord is not entitled to attorneys' fees, as it is not the prevailing party in this litigation (*cf. Excelsior 57th Corp. v Winters*, 227 AD2d 146, 146-147 [1st Dept 1996]).

In view of the foregoing determinations, we need not address the parties' remaining arguments for affirmative relief.

Concur—Gonzalez, P.J., Tom, Friedman, Acosta and Moskowitz, JJ.