Multibank, Inc., Plaintiff,

against
Access Global Capital LLC, James Besch, Global Commodities Group LLC, and Novel Commodities S.A., Defendants.


650637/2016

Kaplan Rice LLP, for plaintiff.
Sullivan & Worcester LLP and Yeskoo Hogan & Tamlyn, LLP, for the Besch Defendants.


Shirley Werner Kornreich, J.

Motion sequence numbers 002 and 003 are consolidated for disposition.
Defendants Access Global Capital LLC (Access), Global Commodities Group LLC (Global), and James Besch (collectively, the Besch Defendants) move, pursuant to CPLR 3211, to dismiss the amended complaint (the AC). Seq. 002. Plaintiff Multibank, Inc. (Multibank) opposes the motion and separately moves, pursuant to CPLR 3215, for a default judgment against defendant Novel Commodities S.A. (Novel). Multibank's default judgment motion is unopposed. For the reasons that follow, the Besch Defendants' motion to dismiss is granted in part and denied in part and Multibank's default judgment motion is granted.
I. Factual Background & Procedural History
As this is a motion to dismiss, the facts recited are taken from the AC (Dkt. 25)[FN1]
and the documentary evidence submitted by the parties.
The plaintiff in this action, Multibank, is a Panamanian commercial bank. Access is a New Jersey LLC and Global is a Delaware LLC; both are owned and controlled by Besch. Novel, which has defaulted in this action, is a Swiss agricultural commodities trading company.
This case concerns a "forfaiting" transaction which, essentially, was a factoring agreement in which Multibank purchased a $4.9 million account receivable from Novel on the sale of beans to non-party Cia Arrocera Covadonga S.A. de C.V. (Covadonga),[FN2]
a Mexican [*2]agricultural company. Covadonga's debt to Novel is governed by a non-recourse promissory note. Since Covadonga was a known credit risk, and given the non-recourse nature of the promissory note, Multibank insisted on Covadonga's debt being insured. To that end, an insurance policy was procured from non-party National Union Fire Insurance Company of Pittsburgh, PA (AIG) that, effectively, functioned as a credit default swap on the promissory note. That policy, however, had certain exclusions, which, in a November 18, 2015 arbitration decision, were held to be applicable, resulting in AIG not providing coverage. See Dkt. 30 (the Arbitration Award).[FN3]
Thus, when Covadonga defaulted on the promissory note, Multibank was unable to recover under the policy and suffered a complete loss on the forfaiting transaction. In this action, Multibank alleges that Besch and his companies, Access and Global, are the reason why the policy exclusions were triggered and, thus, the reason Multibank suffered its loss.
The subject forfaiting transaction began with a sale of Mexican "Mayocoba Beans" (the Beans) by Novel to Covadonga in September 2010 for $4,908,548.37, which, as noted, is governed by a non-recourse promissory note (the Note). See Dkt. 110. Multibank then purchased 90% of the amount due on the Note from Novel for $4,417,693.53. This transaction between Multibank and Novel is governed by a Finance Facility Contract dated September 13, 2010 and executed on October 20, 2010 (the FFC). See Dkt. 26.[FN4]
The FFC states that the accounts receivable on the Note "have been duly collateralized for 90% of the commercial and political risk against protracted default under" a Credit Insurance Policy issued by AIG on June 24, 2010 with a policy period of May 1, 2010 to May 1, 2011. Id. at 2; see Dkt. 27 (the Policy). The Policy insures "Rice [i.e., from the prior transaction], Beans, and other food products." See Dkt. 27 at 3. The Policy's named insured is Access; Multibank and Novel are listed as additional insured. See id. at 31. This is noted in the FFC. See Dkt. 26 at 3. Access was made a party to the FFC and executed it. See id. at 8. Besch signed the FFC on behalf of Access, but not in his individual capacity. See id.
That Access was the named insured is critical to this case. In a written agreement between Access and Novel dated June 8, 2010, Access was engaged to procure the Policy. See Dkt. 28 (the June 2010 Agreement).[FN5]
Section 1 of the June 2010 Agreement provides:
Novel has engaged Access as a financial consultant for the purpose of arranging for bank lines of credit, credit insurance, project finance and capital investment in Novel and its [*3]clients. Credit insurance booked on behalf of Novel by Access Global Capital will be administration [sic] by the latter in strict conformity of the policy terms but always in coordination with Novel and as per their instructions. Any actions taken to be pre-agreed with Novel and no changes nor [sic] amendments to the policy (ies) can be done without written consent of Novel or funding source to whom such policy (ies) might be assigned as loss payee or co-insured.
See Dkt. 28 at 2 (emphasis added). Pursuant to the June 2010 Agreement, Access procured the Policy for the purpose of insuring Covadonga's credit risk on the Note. The Policy insured 90% of the Note, the amount corresponding to what Multibank acquired from Novel under the FFC. Multibank was protected from Covadonga's default by virtue of being named an additional insured under the Policy. From Multibank's perspective, the only risk it was taking was AIG credit risk since, regardless of whether Covadonga paid off the Note or defaulted, Multibank would be paid.
Things did not go so smoothly. The wrinkle in this case was caused by the way in which Beans were sold, a process that did not involve Multibank. In a similar manner to the prior rice transaction, Covadonga did not simply purchase the Beans from Novel. Rather, on September 10, 2010 (i.e., three days before the FFC), Covadonga sold the Beans to Global at a price of $760.60 per metric ton. That same day, Global sold the Beans to Novel at a price of $786.20 per metric ton. Three days later, on September 13, 2010 (the same day of the FFC), Global resold the Beans to Covadonga at a price of $930 per metric ton. This three-step "round trip" payment was effectuated as a financing transaction and proved highly problematic because of Endorsement 15 to the Policy. The Arbitration Award explains:
Endorsement No. 15 is a limitation on coverage, stating that coverage "will not be provided in situations where [Access] and/or Novel have purchased product directly from either [Covadonga], its subsidiaries, or its affiliates and subsequently on-sells the product to either [Covadonga], its subsidiaries, or its affiliates." [AIG] claims that, assuming goods existed and purchases did take place, Novel purchased rice and beans "directly" from Covadonga as part of a single integrated transaction because the alleged intermediary party, Global, was either the alter ego of Access (which admittedly was an agent of Novel) or was itself an agent of Novel and Access.
Dkt. 30 at 26. In other words, "[t]he Policy insured, with some restrictions, a triangular sales arrangement from Covadonga to a First Purchaser, which would sell the goods to Novel, who would then sell them back to Covadonga. A condition of the Policy was that Novel could not purchase the product directly from Covadonga or any related entities." Global Commodities, 2013 WL 4713547, at *1 (emphasis added). The Arbitration Award further explained that "Novel and [Besch] were well aware that this structure involving Global was problematic under the Policy." See Dkt. 30 at 26. Consequently, the Arbitration Award held that AIG is not obligated to provide coverage under the Policy:
Although the Parties have devoted extensive argument to the issue, the Tribunal does not consider it necessary to decide whether Access and Global should be considered alter egos of one another. Even assuming that the two companies are truly separate entities, the Tribunal concludes that Global acted as an undisclosed agent of Novel in the Rice and Beans Transactions and that Novel therefore did purchase the rice and beans "directly" from Covadonga, acting through its agent Global, before reselling the same goods to Covadonga. Endorsement No. 15 provides that the Policy does not cover such [*4]a transaction.
As described above, Global assumed no risk in the Transactions, acted at the direction of Novel and was paid what Novel termed a "margin" of three percent of the value of the final sale for assisting with and lending its name to the arrangements. The price Global "paid" to Covadonga for the "sale" that was the first leg of the Transactions and the price Global notionally "received" from Novel for the second "sale" leg were negotiated between Covadonga and Novel, were artificial and were constructed to provide Global with what was, in effect, a commission.
 
This conclusion is not inconsistent with the fact that Claimants' broker disclosed to AIG during the underwriting process that Novel might purchase Covadonga-sourced goods that had been sold to one of three possible intermediaries, including Global, and resell the goods to Covadonga as part of a three-legged transaction. Claimants did not disclose that Global would be acting as Novel's agent and making purported purchases or sales at non-market prices constructed to provide Global with a "commission." To the contrary, Claimants' broker represented to AIG that "The transactions would be true sales at market values," and AIG was entitled to assume that this statement applied to all legs of the Transactions now in issue.
See id. at 27-28 (emphasis added; paragraph numbering omitted).
Less than three months after the Arbitration Award was issued, on February 8, 2016, Multibank commenced this action by filing its original complaint. See Dkt. 1. It filed the AC on April 29, 2016, which asserts the following causes of action: (1) breach of the FFC and the June 2010 Agreement (the latter is asserted as a third-party beneficiary claim) against Novel, Besch, and Access for failure to procure insurance coverage for Covadonga's default on the Note, and also breach of the FFC against Novel for failure to pay its refinancing costs and the costs of the arbitration;[FN6]
(2) breach of the implied covenant of good faith and fair dealing against Novel, Besch, and Access under the FFC and the June 2010 Agreement for breaching "an implied promise that Covadonga was financially sound and, thus, in a position to honor its payment obligations under the Covadonga promissory note signed over to Multibank [because since the FFC was] non-recourse to Novel, Multibank's only source of repayment was Covadonga or the insurance proceeds under the Policy" [AC ¶ 140];[FN7]
(3) tortious interference with contract (i.e., the FFC and the June 2010 Agreement) against Global; (4) fraudulent inducement of the FFC against Besch, Access, and Novel based on "the severe financial distress of Covadonga (including, without limitation, Besch's failure to inform Multibank that he personally paid a portion of Covadonga's obligation to Multibank under the first promissory note [involving the rice]) and the pre-transaction conclusion that the sales structure employed by Novel, Besch, [*5][Access] and Global for both three legged transactions with Covadonga could invalidate 'ab initio' the Policy" [AC ¶ 154]; (5) negligent misrepresentation against Besch, [Access] and Novel based on their alleged "special relationship with Multibank, which imposed upon them a duty to impart correct information about Covadonga's financial situation and their compliance with the terms of the Policy and the nature of the underlying sales transaction and whether or not it could invalidate the terms of the Policy" [AC ¶ 165]; and (6) breach of fiduciary duty against Besch and Access due to Besch's failure to "ensure that the insureds were in compliance with the Policy terms at all times" and Besch's failure "to disclose Covadonga's financial situation which he knew and was told was critical to Multibank prior to its purchase of the second Covadonga account receivable." See Dkt. 25 at 23-33. Multibank also seeks to pierce the corporate veils of Access and Global and hold Besch personally liable under an alter ego theory of liability. See AC ¶¶ 43-53.
On June 1, 2016, the Besch Defendants filed the instant motion to dismiss the AC. On October 6, 2016, Multibank moved for a default judgment against Novel, which never filed an answer or motion to dismiss. The court reserved on the motion to dismiss after oral argument [see Dkt. 114 (10/28/16 Tr.)], and took the default judgment motion, which is unopposed, on submission to be decided on the papers. 
II. The Besch Defendants' Motion to Dismiss (Seq. 002)
A. Legal Standard
On a motion to dismiss, the court must accept as true the facts alleged in the complaint as well as all reasonable inferences that may be gleaned from those facts. Amaro v Gani Realty Corp., 60 AD3d 491 (1st Dept 2009); Skillgames, LLC v Brody, 1 AD3d 247, 250 (1st Dept 2003), citing McGill v Parker, 179 AD2d 98, 105 (1st Dept 1992); see also Cron v Hargro Fabrics, Inc., 91 NY2d 362, 366 (1998). The court is not permitted to assess the merits of the complaint or any of its factual allegations, but may only determine if, assuming the truth of the facts alleged and the inferences that can be drawn from them, the complaint states the elements of a legally cognizable cause of action. Skillgames, id., citing Guggenheimer v Ginzburg, 43 NY2d 268, 275 (1977). Deficiencies in the complaint may be remedied by affidavits submitted by the plaintiff. Amaro, 60 NY3d at 491. "However, factual allegations that do not state a viable cause of action, that consist of bare legal conclusions, or that are inherently incredible or clearly contradicted by documentary evidence are not entitled to such consideration." Skillgames, 1 AD3d at 250, citing Caniglia v Chicago Tribune-New York News Syndicate, 204 AD2d 233 (1st Dept 1994). Further, where the defendant seeks to dismiss the complaint based upon documentary evidence, the motion will succeed if "the documentary evidence utterly refutes plaintiff's factual allegations, conclusively establishing a defense as a matter of law." Goshen v Mutual Life Ins. Co. of NY, 98 NY2d 314, 326 (2002) (citation omitted); Leon v Martinez, 84 NY2d 83, 88 (1994).
B. Statute of Limitations
The Besch Defendants contend that Multibank's claims are time bared under Panamanian law. They rely on the rule that "[w]hen a nonresident sues on a cause of action accruing outside New York, CPLR 202 requires the cause of action to be timely under the limitation periods of both New York and the jurisdiction where the cause of action accrued." Global Fin. Corp. v Triarc Corp., 93 NY2d 525, 528 (1999). "When an alleged injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss." Id. at 529, citing Smith Barney, Harris Upham & Co. v Luckie, 85 NY2d 193, 207 (1995). [*6]Multibank does not deny that its injuries were suffered in the jurisdiction of its incorporation — Panama. See Norex Petroleum Ltd. v Blavatnik, 23 NY3d 665, 671 (2014) ("As a resident of Alberta, Canada, alleging purely economic injuries, Norex's injuries accrued in Alberta."). Consequently, under CPLR 202, to be considered timely, Multibank's claims must be timely under both New York and Panamanian law. See 2138747 Ontario, Inc. v Samsung C & T Corp., 144 AD3d 122 (1st Dept 2016).
According to the Besch Defendants, the longest applicable statute of limitations under Panamanian law is three years. Therefore, they argue that Multibank's claims became time barred in October 2013, three years after the FFC was executed in October 2010. This action, as noted, was commenced on February 8, 2016.
On this motion, the Besch Defendants are not entitled to dismissal based on the applicable Panamanian statutes of limitation. CPLR 3016(e) provides that "where a defense is based upon the law of a foreign country or its political subdivision, the substance of the foreign law relied upon shall be stated." Edwards v Erie Coach Lines Co., 17 NY3d 306, 328 (2011). "CPLR 3016(e) must be read together with CPLR 4511(b)", which states that the court may take judicial notice of foreign law "if a party requests it, furnishes the court sufficient information to enable it to comply with the request, and has given each adverse party notice of his intention to request it." See id. CPLR 4511(d) further provides that a:

copy of a statute or other written law contained in a book or publication, purporting to have been published by a government or commonly admitted as evidence of the existing law in the judicial tribunals of the jurisdiction where it is in force, is prima facie evidence of such law and the unwritten or common law of a jurisdiction may be proved by witnesses or printed reports of cases of the courts of the jurisdiction. (emphasis added). 
While this court "may choose to take judicial notice of laws of a foreign jurisdiction, [] it is only required to do so when the party requesting the notice provides 'sufficient information to enable it to comply with the request.'" Sea Trade Mar. Corp. v Coutsodontis, 111 AD3d 483, 484 (1st Dept 2013). "Expert affidavits interpreting the relevant legal provisions can be a basis for constructing foreign law when accompanied by sufficient documentary evidence." Id. at 484-85. However, this court may decline to take judicial notice of foreign law if it is not provided with sufficient information about the applicability of that law, including the very foreign statues at issue. See id. at 485 ("we found that the motion court properly declined to take judicial notice of certain French Ordinances in [Warin v Wildenstein & Co., Inc., 297 AD2d 214, 215 (1st Dept 2002)] because it was not provided with sufficient information to determine the scope and effect of the Ordinances. Specifically, the defendants' French law expert failed to explain the interplay between the time limits in the Ordinances and those in the generally applicable French Civil Code, or to provide French jurisprudence interpreting the Ordinances, and only provided his opinion that the action was time-barred under both the Ordinances and the Code.") (emphasis added).
In support of its motion, the Besch Defendants submitted an affirmation of a Panamanian attorney, Roy C. Durling T., Esq. See Dkt. 41. The Besch Defendants did not submit a copy of the actual Panamanian statutes with their moving papers. See Dkt. 57 at 9 ("Without offering either Spanish or English language versions of the Commercial Code of Panama for the Court's review, Mr. Durling opines that the [] FFC is governed by a three year [limitations] period."). Nor did the Besch Defendants explain why, under Panamanian law, Multibank's claims would [*7]have accrued, at the latest, by October 20, 2013 (the date the FFC was executed). The Besch Defendants also did not explain the effect, if any, of Panamanian law on section 5.1 of the FFC, which provides that Multibank's claims "shall not be liable to prescription or otherwise barred by the relevant statute of limitations until 5 years after the respective maturity date of the [Note, i.e., February 10, 2016]." See Dkt. 26 at 7. This action was commenced two days before that deadline. While the Besch Defendants question whether section 5.1 is enforceable under New York law [see John J. Kassner & Co. v City of New York, 46 NY2d 544, 550 (1979)], that is irrelevant since, under CPLR 213(2), Multibank's claim for breach of the FFC is timely because it was brought within 6 years of breach. See ACE Secs. Corp., Home Equity Loan Trust, Series 2006-SL2 v DB Structured Prods., Inc., 25 NY3d 581, 592-94 (2015).[FN8]

These critical omissions were pointed out in Multibank's opposition. In reply, the Besch Defendants submitted a somewhat more robust affirmation from Mr. Durling that purports to remedy these defects. See Dkt. 65. Even if these arguments, made for the first time in reply, were to be considered, the court still could not deicide the question of whether this action should be dismissed under Panamanian law. That is because Multibank has submitted an agreement, fully executed on May 17, 2012, that purports to toll its claims against the Besch Defendants until after the Arbitration Award was issued on November 18, 2015. See Dkt. 46 (the Tolling Agreement). The Tolling Agreement is governed by New York law. See id. at 3.[FN9]
If the Tolling Agreement is operative, Multibank's claims would be timely.[FN10]

The Besch Defendants, however, argue that they are not bound by the Tolling Agreement because they did not sign it, even though their counsel drafted and inserted the tolling provisions to induce Multibank not to file suit unless and until the arbitrators decided that AIG need not provide coverage.[FN11]
The Tolling Agreement was only signed by Novel, Multibank, and non-party Israel Discount Bank of New York (IDB), and not any of the Besch Defendants. See Dkt. [*8]46 at 5-7. Nonetheless, the parties hotly dispute the circumstances of the Tolling Agreement's execution and the legal implications of the Besch Defendants not having signed it. Multibank, moreover, claims that the Besch Defendants otherwise acted in accordance with the Tolling Agreement and accepted its benefits, the most notable being that Multibank did not sue them until after the arbitration.
At the outset, the Tolling Agreement states that Novel, IDB, Multibank, and Access (defined as the Parties) "hereby agree as follows". See id. at 1.[FN12]
It then sets forth six whereas clauses that memorialize: (1) the parties' prior rice transaction; (2) the FFC; (3) that the FFC concerns the Note and refers to the Policy; (4) that Covadonga defaulted on the Note and that AIG refused to provide coverage under the Policy; (5) that the "Parties wish swiftly to commence arbitration proceedings ("Arbitration") against [AIG to recover] under the Policy while reserving all of the Parties' respective rights, claims, and defenses as against one another under the [FFC]"; and (6) that the "Parties wish to defer resolution of the [FFC] Disputes." See id. The Tolling Agreement then addresses how the arbitration was to be commenced, operated, and funded. See id. at 2-4. Michael T. Suillivan, Esq. of Sullivan & Worcester LLP (S & W) was initially counsel for Novel in the arbitration and had his fees largely paid for by Multibank; but, for reasons he refuses to disclose, he withdrew, delaying the arbitration and requiring Multibank's counsel to take over. See id. at 3 ("S & W are attorneys for Novel, and not [IDB] or Multibank").[FN13]
Mr. Sullivan represents the Besch Defendants in this action.
Section 9 of the Tolling Agreement provides:
The Parties reserve all their respective rights under the [FFC, the Note, and the Policy] at law, or in equity. Nothing in this Agreement shall be construed to modify the terms of the [FFC] or prejudice any Party's rights or affect the validity of any claim any Party may have against any third party, any other Party, or against [AIG], including (for the avoidance of doubt but without limitation) any claim by [IDB] and/or Multibank to recover the totality of their unpaid losses from Novel or Access; provided, however, that neither [IDB] nor Multibank shall make any claim against Novel or Access concerning or relating to the [FFC], the Note[], or the Policy until the conclusion of the Arbitration (if the Arbitration is commenced promptly in accordance with Section 1 hereof), including any Related Proceedings, or upon execution of a final settlement with the Insurer ("Termination Date"). The Parties agree to toll the statutes of limitations applicable to any claim to be filed by any Party against any other Party from the date of this Agreement through sixty (60) days after the Termination Date.
See Dkt. 46 at 3 (emphasis added).
The Tolling Agreement was executed in connection with an arbitration where there was a dispute (litigated in federal court) about who was required to participate. In the arbitration context, the Court of Appeals has adopted "the direct benefits theory of estoppel", pursuant to which a non-signatory is bound by an arbitration agreement where the non-signatory [*9]"'knowingly exploits' the benefits of an agreement containing an arbitration clause, and receives benefits flowing directly from the agreement." Belzberg v Verus Investments Holdings Inc., 21 NY3d 626, 631 (2013) (emphasis added), citing, e.g., Reid v Doe Run Resources Corp., 701 F3d 840, 846 (8th Cir 2012) ("Direct benefits estoppel applies when a nonsignatory knowingly exploits the agreement containing the arbitration clause."). "A benefit is indirect where the nonsignatory exploits the contractual relation of the parties, but not the agreement itself." Id. In contrast, a benefit is direct when the non-signatory exploits the agreement itself. Id.
Here, Access did not merely exploit the parties' relationship, but specifically obtained the very benefits the Tolling Agreement, i.e., the funding of the arbitration (which, if successful, would effectively absolve Access of liability) and Multibank not promptly filing suit against Access. See BGC Notes, LLC v Gordon, 142 AD3d 435, 438 (1st Dept 2016) ("Although BGC Notes was not a signatory to the employment agreement, which is the document actually containing the arbitration provision, BGC Notes nonetheless received a 'direct benefit' directly traceable to the employment agreement."). Despite knowing of and receiving the benefits of the Tolling Agreement, Access now seeks to disclaim its essential promise — to permit Multibank's claims against it to be tolled until after the arbitration. Multibank clearly intended to sue Access if it lost in the arbitration, and it also was mindful of the statue of limitations. There is, therefore, a plausible inference to be drawn here that Multibank did not believe waiting to sue Access until after the arbitration would result in its claims becoming time barred, and that it had such a belief by virtue of the Tolling Agreement.
These circumstances fall within New York's equitable tolling doctrine. Equitable estoppel will apply "where plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action." Zumpano v Quinn, 6 NY3d 666, 674 (2006) (citation omitted). Thus, a party who deceptively induces another not to sue is subject to having the statute of limitations equitably tolled against it. However, "[e]quitable estoppel defeats an otherwise valid statute of limitations defense only where the party invoking the doctrine has reasonably relied on the deceptive conduct alleged to have given rise to the estoppel." K-Bay Plaza, LLC v Kmart Corp., 132 AD3d 584, 589 (1st Dept 2015) (emphasis added), citing Zumpano, 6 NY3d at 674. "[T]he question of what constitutes reasonable reliance is not generally a question to be resolved as a matter of law on a motion to dismiss." ACA Fin. Guar. Corp. v. Goldman, Sachs & Co., 25 NY3d 1043, 1045 (2015). In this case, there are questions about whether Multibank's reliance was reasonable. Access negotiated the Tolling Agreement, is actually named as a party to that contract, and indisputably obtained its benefits; but, for reasons that are disputed, Access did not actually sign the Tolling Agreement. The parties' conflicting accounts cannot be resolved on a motion to dismiss because Multibank's allegations must be assumed to be true. Therefore, questions, for instance, about why Access, whose counsel helped draft the Tolling Agreement, was made a party to it but never signed it, must be probed in discovery. While these are issues for discovery, the Tolling Agreement robustly memorizes its context and explains its purpose, which, accompanied by Mutibank's well-pleaded allegations, suffice to warrant denial of the Besch Defendants' motion.
That being said, even if the outcome here under New York's tolling law would warrant dismissal, Multibank has not adequately explained how tolling works under Panamanian law, let alone how Panamanian law would resolve the facts of this case. Since the Besch Defendants [*10]insist that Panamanian law applies,[FN14]
they are not entitled to a statute of limitations dismissal due to their failure to properly introduce evidence of the applicable Panamanian law.
C. Substantive Claims Against the Besch Defendants
Multibank has properly pleaded a claim for breach of contract against Besch and his companies, Access and Global. Access and Global, allegedly, are alter egos of each other and Besch. It was Access' responsibility under the FFC and June 2010 Agreement to procure credit insurance for the Note. Access, to be sure, is a party to the FFC and the June 2010 Agreement. As previously discussed, it was Access that procured the Policy and Global that participated in the three-step "round trip" payment with Covadonga. In other words, Besch caused Access to procure the Policy while, at the same time, he caused Global to engage in the sham Beans transaction that precluded coverage under the Policy. It was Besch, therefore, that caused Multibank's loss. This is not a question of fact; it was adjudicated by the arbitrators. Since it was Besch's fault that AIG did not have to provide coverage, Multibank seeks to hold him and his companies responsible. The well-pleaded allegations in the AC suffice to state a claim that the Besch Defendants, acting under the direction of Besch, caused Multibank not to have the very insurance coverage it was promised under the FFC. 
The AC sets forth alternative theories of liability, which is permissible at the pleading stage. CPLR 3014; see Kerzhner v G4S Gov't Solutions, Inc., 138 AD3d 564, 565 (1st Dept 2016) ("plaintiff may plead alternative, inconsistent theories"). Multibank contends that Access [FN15]
 breached the FFC and its duties to Multibank as an intended third-party beneficiary under the June 2010 Agreement, and that all three Besch Defendants are liable because they are alter egos. Access disputes its third-party beneficiary liability to Multibank under the June 2010 Agreement.
The Appellate Division has explained: 
A non-party [to a contract] may sue for breach of contract only if it is an intended, and not a mere incidental, beneficiary. However, the identity of a third-party beneficiary need not be set forth in the contract or, for that matter, even be known as of the time of its execution. A party asserting rights as a third-party beneficiary must establish (1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for [its] benefit and (3) that the benefit to [it] is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate [it] if the benefit is lost. In determining third-party beneficiary status it is permissible for the court to look at the surrounding circumstances as well as the agreement, and the obligation to perform to the third party beneficiary need not be expressly stated in the contract.
Bd. of Educ. of Northport-E. Northport Union Free Sch. Dist. v Long Island Power Auth., 130 [*11]AD3d 953, 954-55 (2d Dept 2015) (emphasis added; citations and quotation marks omitted).[FN16]

Hence, the fact that Multibank is not named in the June 2010 Agreement is not dispositive, especially since Multibank alleges that the Policy was specifically procured for its benefit. See Encore Lake Grove Homeowners Ass'n, Inc. v Cashin Assocs., P.C., 111 AD3d 881, 883 (2d Dept 2013) ("plaintiffs submitted an affidavit from the Village Attorney attesting that the Village engaged the defendant to perform the subject inspections for the benefit of the purchasers of the subject condominiums"), citing MK W. St. Co. v Meridien Hotels, Inc., 184 AD2d 312, 313 (1st Dept 1992) ("the identity of a third-party beneficiary need not be set forth in the contract or, for that matter, even be known as of the time of its execution" ). Indeed, it is undisputed that Multibank was meant to benefit from the Policy because it is named as an additional insured. Additionally, the FFC, to which Access is a party, specifically notes that Multibank is meant to be protected by the Policy. Nor is the fact that the June 2010 Agreement predated the FFC dispositive since the parties apparently intended the contracts to be part of an interrelated transaction. The Policy was meant to cover both the rice and beans transactions. At a minimum, Multibank has raised questions of fact about its status as an intended third-party beneficiary that must be probed in discovery.
Multibank also has properly pleaded a claim for tortious interference with contract against Global. "Tortious interference with contract requires the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom." Lama Holding Co. v Smith Barney Inc., 88 NY2d 413, 424 (1996) (emphasis added). Global knew of Access' obligation to procure insurance since Besch operated both companies, but, as adjudicated by the arbitrators, Global defeated Multibank's coverage under the Policy due to Global's structure of the Beans transaction with Covadonga.
That being said, Multibank's claims predicated on the Besch Defendants' failure to disclose Covadonga's precarious financial situation are not viable. These claims are pleaded as causes of action for fraud, negligent misrepresentation, and breach of the implied covenant of good faith and fair dealing. The fraud claim is dismissed because the Besch Defendants are not alleged to have made any misrepresentation about Covadonga. See Basis Yield Alpha Fund (Master) v Goldman Sachs Group, Inc., 115 AD3d 128, 135 (1st Dept 2014) ("To make a prima facie claim of fraud, a complaint must allege misrepresentation or concealment of a material fact"). Neither the AC nor the contracts contain any false claim about Covadonga. While the FFC contains warranties regarding Covadonga, such warranties were not made by the Besch Defendants; they were made by "Seller", defined as Novel. See Dkt. 26 at 2, 4-6. And, in section 3.16, it is only the Seller that warrants its lack of knowledge about Covadonga's financial situation. See id. at 6. The parties knew how to distinguish between Novel and Access. For [*12]instance, in section 3.7, Access is obligated to take certain steps to ensure coverage. See id. at 4.[FN17]
Multibank cannot predicate a claim for fraud against Access based on representations made only by Novel.[FN18]

The negligent misrepresentation claim fails because no relationship of confidence existed between Multibank and the Besch Defendants, as they did not even directly interact. See Kimmell v Schaefer, 89 NY2d 257, 263 (1996) ("liability for negligent misrepresentation has been imposed only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified."). The Besch Defendants were responsible to Access only for obtaining insurance. They are not alleged to be Mexican agricultural company solvency experts, nor, as discussed below, did they actually represent anything about Covadonga's solvency. See id. at 264 ("The analysis in a commercial case such as this one is necessarily different from those cases because of the absence of obligations arising from the speaker's professional status. In order to impose tort liability here, there must be some identifiable source of a special duty of care."). At most, the Besch Defendants were contractually responsible for procuring sufficient insurance coverage, and their failure to do so gives rise to contractual claims. See Camacho v IO Practiceware, Inc., 136 AD3d 415, 416 (1st Dept 2016); Bd. of Managers of Beacon Tower Condo. v 85 Adams St., LLC, 136 AD3d 680, 684 (2d Dept 2016); see also Moustakis v Christie's, Inc., 68 AD3d 637 (1st Dept 2009) (where "there is no pleading of the breach of a duty separate and apart from the contractual obligation owed to plaintiff it is axiomatic that 'a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated.'"), quoting Clark-Fitzpatrick, Inc. v Long Island R.R. Co., 70 NY2d 382, 389 (1987). In fact, since Multibank negotiated a warranty in which Novel disclaimed the very sort of knowledge that Access is claimed to have withheld, but did not procure such a warranty from Access, that alone should defeat this claim. See ACA, 25 NY3d at 1045, distinguishing Centro Empresarial Cempresa S.A. v Am. Movil, S.A.B. de C.V., 17 NY3d 269, 274-79 (2011). Moreover, the very fact that Multibank insisted on procuring insurance to guard against Covadonga's credit risk demonstrates that it understood that Covadonga posed foreseeable credit risk. Multibank, nonetheless, does not claim to have conducted any due diligence on Covadonga's solvency. Under these circumstances, reliance on the Besch Defendants' failure to disclosure Covadonga's financial situation would be unreasonable. See HSH Nordbank AG v UBS AG, 95 AD3d 185, 195 (1st Dept 2012).
The implied covenant claim fails for similar reasons. While all contracts contain the implied covenant of good faith and fair dealing [511 W. 232nd Owners Corp. v Jennifer Realty Co., 98 NY2d 144, 153 (2002)], the failure to disclose Covadonga's financial situation cannot be said to have defeated Multibank's ability to recover the fruits of the FFC. See Dalton v Educational Testing Serv., 87 NY2d 384, 389 (1995). The Policy's purpose was to guard against Covadonga's default because it was a known credit risk. The Policy was meant to protect [*13]Multibank from a default by Covadonga. Even if the Besch Defendants had an implied duty to warn Multibank of Covadonga's credit risk, that is not what caused Multibank's damages. Failure to act within the parameters of the insurance coverage was the cause.
An implied covenant breach is a breach of contract. Smile Train, Inc. v Ferris Consulting Corp., 117 AD3d 629, 630 (1st Dept 2014). Breach of contract damages are limited to those caused by the breach. Nevco Contracting Inc. v R.P. Brennan Gen. Contractors & Builders, Inc., 139 AD3d 515 (1st Dept 2016). The fact that Multibank's loss was really caused by the lack of insurance due to the way in the Besch Defendants structured the Beans sale, and not Covadonga's default, is fatal to Multibank's implied covenant claim.
The court also dismisses Multibank's breach of fiduciary duty claim based on the Besch Defendants' failure to ensure that there was coverage under the Policy. The Besch Defendants did not owe fiduciary duties here and, even if they did, the claim is dismissed because it is duplicative of Multibank's breach of contract claims. The Besch Defendants did not advise Multibank. See EBC I, Inc. v Goldman, Sachs & Co., 5 NY3d 11, 19 (2005) ("A fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.") (citation and quotation marks omitted). It was only Novel that made representations about Covadonga. The Besch Defendants, in contrast, simply failed to fulfill their contractual obligations to procure and maintain credit insurance. Those obligations are exclusively defined by the two governing contracts (the FFC and the June 2010 Agreement). "While a contractual relationship is not required for a fiduciary relationship, 'if [the parties] do not create their own relationship of higher trust, courts should not ordinarily transport them to the higher realm of relationship and fashion the stricter duty for them.'" Oddo Asset Mgmt. v Barclays Bank PLC, 19 NY3d 584, 593 (2012), quoting N.E. Gen. Corp. v Wellington Advertising, Inc., 82 NY2d 158, 162 (1993) (ordinary commercial transactions do not give rise to fiduciary duties). If the Besch Defendants are not found to have breached the contracts, then there is no separate basis to impose any fiduciary duty liability since, as they did not deal directly with each other, the contracts were the extent of their relationship. The fiduciary duty claim is dismissed because Multibank "fails to allege conduct by [the Besch Defendants] in breach of a duty other than, and independent of, that contractually established between the parties and is thus duplicative." Kaminsky v FSP Inc., 5 AD3d 251, 252 (1st Dept 2004)
D. Alter Ego Allegations
Judge Scheindlin has already held that there are questions of fact about the viability of Multibank's alter ego claims that require discovery to resolve. See Global Commodities, 2013 WL 4713547, at *5-6 ("questions remain as to whether Access used Global to further its plan to circumvent the restrictions placed on the transactions. [AIG] has alleged enough of an interrelationship between Access and Global to show that discovery is necessary to determine if there are material issues of fact as to whether the corporations are alter egos [There also] are questions as to whether Besch used Access to further his plan to circumvent the restrictions placed on the transactions.").[FN19]
This court agrees with Judge Scheindlin's analysis. None of the [*14]evidence cited by the Besch Defendants resolves the relevant veil piercing questions, especially not on a motion to dismiss.[FN20]
It should be noted that Judge Scheindlin never reached the merits because the parties settled. As noted earlier, while the arbitrators held that Global was Novel's agent, they also never reached the merits of the alter ego claims. See Dkt. 30 at 27 ("the Tribunal does not consider it necessary to decide whether Access and Global should be considered alter egos of one another."). The merits of Multibank's alter ego allegations will be adjudicated in this action after discovery.
III. Multibank's Default Judgment Motion (Seq. 003)
"When a defendant has failed to appear . . . the plaintiff may seek a default judgment against him." CPLR 3215(a). A party moving for a default judgment must "file proof of service and proof of the facts constituting the claim, the default and the amount due." CPLR 3215(f). A defaulting defendant "admits all traversable allegations in the complaint, including the basic allegation of liability." Rokina Optical Co. v Camera King, Inc., 63 NY2d 728, 730 (1984); see Woodson v Mendon Leasing Corp., 100 NY2d 62, 71 (2003) ("defaulters are deemed to have admitted all factual allegations contained in the complaint and all reasonable inferences that flow from them."). Here, Multibank's counsel submitted an affirmation in which she attests to the fact that Novel was served and has knowledge of this lawsuit. See Dkt. 99. The well pleaded allegations in the AC, along with the evidence submitted on this motion, is a sufficient showing of merit. See Feffer v Malpeso, 210 AD2d 60, 61 (1st Dept 1994). 
Due to Novel's failure to file an answer or motion to dismiss, Multibank seeks a default judgment against it. Since Novel, like the Besch Defendants, allegedly caused Multibank not to receive coverage under the Policy, Multibank seeks what it would have recovered had Novel not caused the Policy exclusions to be triggered. Thus, Multibank "requests that a default judgment in the sum certain amount of $4,057,693.53, the insured portion of the second Covadonga promissory note, plus [9% statutory pre-judgment interest] from September 23, 2011, which is the date when the waiting period under the Policy lapsed, through the date of entry of judgment to be entered against [Novel]." See Dkt. 99 at 5. As set forth below, judgment is granted to this effect, and the action shall be severed and shall continue against the Besch Defendants.Accordingly, it is
ORDERED that the motion by defendants Access Global Capital LLC, Global Commodities Group LLC, and James Besch to dismiss the amended complaint is granted in part to the extent that the second (breach of the implied covenant of good faith and fair dealing), [*15]fourth (fraudulent inducement), fifth (negligent misrepresentation), and sixth (breach of fiduciary duty) causes of action are dismissed against said defendants, and the motion is otherwise denied; and it is further
ORDERED that the motion by plaintiff Multibank, Inc. for a default judgment against defendant Novel Commodities S.A. is granted, and the Clerk is directed to enter judgment in favor of said plaintiff, and against said defendant, in the amount of $4,057,693.53 plus 9% statutory pre-judgment interest from September 23, 2011 to the date judgment is entered; and it is further
ORDERED that such judgment is hereby severed and the action shall continue against the remaining defendants; and it is further
ORDERED that the parties are to appear in Part 54, Supreme Court, New York County, 60 Centre Street, Room 228, New York, NY, for a preliminary conference on February 9, 2017, at 11:30 in the forenoon, and the parties' pre-conference joint letter shall be e-filed and faxed to Chambers at least one week beforehand.
Dated: January 9, 2017
J.S.C.



Footnotes

Footnote 1:References to "Dkt." followed by a number refer to documents filed in this action on the New York State Courts Electronic Filing (NYSCEF) system.

Footnote 2:The forfaiting transaction at issue in this case is actually the second of two similarly structured transactions entered into by the parties. The first transaction (involving rice, instead of beans) is not at issue.


Footnote 3:There was a prior action in federal court in which Global sought to stay the arbitration and where AIG took the positon that the Besch Defendants are alter egos. See Global Commodities Group, LLC v Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 2013 WL 4713547, at *1 (SDNY 2013) (Scheindlin, J.) As discussed below, Judge Scheindlin held that there are genuine questions of fact about whether the Besch Defendants are alter egos. See id. at *3-6. That action settled prior to a ruling on the alter ego issue. The parties then proceeded to arbitration, where, as explained herein, the alter ego issue also was not ruled on.

Footnote 4:The FFC is governed by New York law and provides for jurisdiction in this court. See Dkt. 26 at 7.


Footnote 5:The June 2010 Agreement is governed by New Jersey law and contains a New Jersey forum selection clause (which has not been invoked in this action). See Dkt. 28 at 4.

Footnote 6:All of these claims are pleaded in the first cause of action despite allegations of multiple breaches of multiple contracts asserted against multiple defendants.


Footnote 7:As discussed herein, this claim is meritless. A principal reason to procure default insurance is because the debtor is a credit risk. The problem was not the solvency of Covadonga, a known risk, but the conduct of the Besch Defendants that resulted in Multibank not receiving coverage under the Policy.

Footnote 8:Neither the Besch Defendants nor their expert explain if Kassner applies to tolling a foreign statute of limitations before a claim accrues, nor if Panama has a rule similar to Kassner.


Footnote 9:Unlike section 5.1 of the FFC, the Besch Defendants do not argue that the Tolling Agreement is unenforceable under Kassner since, at the time it was executed, Multibank's claims had accrued. Kassner only prohibits the tolling of claims prior to accrual. See Deutsche Bank Nat's Trust Co. v Flagstar Capital Markets Corp., 143 AD3d 15, 19 (1st Dept 2016) ("Although parties may agree after a cause of action has accrued to extend the statute of limitations, an 'agreement to ... extend the Statute of Limitations [that] is made at the inception of liability [will be] unenforceable because a party cannot 'in advance, make a valid promise that a statute founded in public policy shall be inoperative.""), quoting Kassner, 46 NY2d at 551.


Footnote 10:At most, the statute of limitations ran for approximately one year and seven months between October 20, 2010 (the date of the contract) and May 17, 2012 (the date of the Tolling Agreement), and then for less than three months between November 18, 2015 and February 8, 2016, which is less than three years in total.


Footnote 11:This makes commercial sense since, if AIG provided coverage, Multibank's loss on the FFC would have been recouped. In that event, this litigation would have been unnecessary.


Footnote 12:Neither Besch nor Global are named as parties (nor, like Multibank, did they execute the Tolling Agreement). However, by virtue of the alter ego allegations discussed below and the Tolling Agreement's possible application to Access, the statute of limitations basis for dismissal proffered by Besch and Global is rejected at this juncture.

Footnote 13:Multibank has not moved to disqualify Mr. Suillivan.

Footnote 14:While the Tolling Agreement is governed by New York law, the question of whether the claims are timely is governed by Panamanian law since, as noted, timeliness under New York's statute of limitations is not in dispute.

Footnote 15:Even if Access itself did not have a contractual responsibility under the FFC (as opposed to under the June 2010 Agreement) to procure the insurance, the arbitrators found that Global was acting as Novel's agent when procuring the Policy. Since Access is alleged to be an alter ego of Global, Global causing Novel to breach may still result in Access' liability.

Footnote 16:While the June 2010 Agreement is governed by New Jersey law, the court relies on the parties' citations to New York law because no conflict of laws is claimed to exist. See Excess Ins. Co. v Factory Mut. Ins. Co., 2 AD3d 150, 151 (1st Dept 2003) ("In a conflicts of law analysis, the first consideration is whether there is any actual conflict between the laws of the competing jurisdictions. If no conflict exists, then the court should apply the law of the forum state in which the action is being heard"), aff'd 3 NY3d 577 (2004).

Footnote 17:This undercuts the notion that Access had no direct contractual obligation to Multibank to ensure coverage.


Footnote 18:While Global was found by the arbitrators to be Novel's agent for the purpose of the Beans transactions, Multibank does not allege that Novel and Access are alter egos.

Footnote 19:"The question of whether defendants' corporate veils should be pierced will be determined by the laws of each defendant's state of incorporation." Flame S.A. v Worldlink Int'l (Holding) Ltd., 107 AD3d 436, 438 (1st Dept 2013). For this reason, Judge Scheindlin held that "Delaware law controls whether Access and Global are alter egos while New Jersey Law determines whether Besch is the alter ego of Access." See Global Commodities, 2013 WL 4713547, at *3.


Footnote 20:This is not a summary judgment motion, and thus the fact that there is a more robust discovery record before this court than was before Judge Scheindlin and the arbitrators is not dispositive. On this motion to dismiss, the alter ego allegations may only be dismissed if, based on the AC and documentary evidence, it is clear that such allegations have no merit. On the contrary, there clearly are questions about whether the way in which Besch used Access and Global in structuring the transactions was done for the purpose of defrauding Multibank. It is the parties' testimony, and not simply the documents, that is necessary to adjudicate this claim. As a result, disposition on a motion to dismiss is improper.