[885 NYS2d 473]

CSAM Capital, Inc., et al., Respondents, v Ronald S. Lauder et al., Appellants.

First Department, September 22, 2009

**APPEARANCES OF COUNSEL**

*Daniel R. Solin*, New York City, and *Cohen Kinne Valicenti & Cook LLP*, Pittsfield, Massachusetts (*Kevin M. Kinne* and *David E. Valicenti* of counsel), for appellants.

*Manatt, Phelps & Phillips, LLP*, New York City (*Mathew S. Rosengart* and *Arunabha Bhoumik* of counsel), for respondents.

**OPINION OF THE COURT**

CATTERSON, J.

This proceeding arises out of an arbitration brought by the

appellant investors against CSAM Capital, Inc., the general partner of a high-risk exchange fund, and allegedly related entities (hereinafter referred to as CSAM), alleging, inter alia, fraud in relation to the loss of their investments in the fund. The investors appeal from an order dismissing their claims as time-barred. Because we find that the investors could not have known of the fraud they allege, we reinstate their claim for arbitration.

The appellants are limited partners in DLJ Emerging Growth Partners, L.P., an exchange fund (hereinafter referred to as the fund),[1] having joined in 1999 and 2000. Prior to joining, the appellants received a private placement memorandum (hereinafter referred to as the PPM) and a subscription booklet. The PPM underscored the high-risk nature of the fund, explaining that it was particularly risky because it contained newly emerging, high-technology dot-com stocks with little or no operating histories. The PPM said that an "active hedging strategy" would be implemented to mitigate the substantial risks inherent in the fund. According to the PPM, this hedging strategy would be overseen and implemented by 13 officers and directors having *"extensive experience"* and *"significant expertise in the design and use of . . . sophisticated hedging techniques"* (emphasis added).

Additionally, the subscription booklet provided that any claims would be settled by arbitration, and that the agreement "shall be governed, construed, and enforced in accordance with the laws of the State of New York."

It is undisputed that in March 2000, the fund had a total asset value of over $254 million, but had only engaged in one $30 million value hedge. After the hedge expired in May 2000, the fund did not engage in any further hedging. It is further

---

1. In its brief, CSAM explains that
    "[e]xchange funds are investment vehicles that permit wealthy investors to obtain immediate, tax-free diversification of highly-appreciated positions in a single security by receiving limited partnership interests in a pool of securities in exchange for the investor's single security. After investors contribute securities to an exchange fund, they no longer own those securities outright. Rather, in exchange for their contributions, they own a percentage interest in the fund, which is comprised of a 'basket' of the securities contributed by the fund's other limited partners/investors.
    "Exchange fund investors do not incur capital gains taxes upon contribution of their securities to a fund. Thus, they are effectively able to diversify tax free. The minimum required investment is typically one million dollars."

undisputed that by September 2002, the fund had lost more than 90% of its value—approximately $240 million.

In the meantime, in July 2001, two of the appellants, James and Debbie Heller,[2] wrote a letter (hereinafter referred to as the Heller letter) to John Paolella, Director of Exchange Fund Products for CSAM LLC. The Hellers said that their investment had been "decimated," and sought an explanation for a "series of irresponsible, wrong headed [sic], misguided and disastrous decisions by the [f]und managers def[ying] any definition of prudent financial management," suggesting that the cause was "gross mismanagement . . . and a breach of the [f]und management's fiduciary responsibility."

Paolella replied with a four-page letter dated August 17, 2001 (hereinafter referred to as the Paolella letter), outlining the reasoning behind the fund's investment decisions. The letter concluded as follows:

> "[T]he [f]und was structured to accommodate new and relatively untested companies of the so-called 'new economy.' Unfortunately, the extreme down turn [sic] in the valuations of 'new economy' securities paralleled the [f]und's downturn. In trimming the portfolio to meet margin calls, we endeavored to retain positions in those companies that had, in the General Partner's view, the greatest chance of survival and future growth. We hope that the [f]und will regain some of its lost value in the years to come.
>
> "We hope that you now have a better understanding of the decisions that were made in the management of this [f]und. Although we understand your disappointment with the [f]und's performance thus far, we believe we have nevertheless discharged our duty as a fiduciary."

In 2004, the appellants received a consolidated financial statement (hereinafter referred to as the CFS) dated December 31, 2003. The CFS disclosed that in February 2003, a limited partner had commenced an arbitration "proceeding, asserting '[c]laims for breach of contract, breach of fiduciary duty, misrepresentation, and gross negligence' in connection with [CSAM's] management and operation of the Partnership." The

---

**2.** Although the Hellers are among the appellants in this case, the record reflects that they acted independently in writing their 2001 letter to CSAM.

CFS further stated that CSAM was defending the matter, and believed it to be without merit. The record does not reflect any attempt made on behalf of the appellants to investigate this claim further.

Also in 2004, two other investors, Dixon and Carol Doll, filed an arbitration statement of claim (hereinafter referred to as the Doll SOC). The record does not include factual evidence that the appellants were informed of this arbitration at that time. Moreover, although the Doll SOC included several counts of fraudulent misrepresentation in connection with the operation of the fund, it contained no claims or assertions relating to the qualifications of the fund's directors.

On November 7, 2006, Hugh M. Neuburger, whom the PPM had named as one of the 13 experts who would implement the fund's hedging strategy, testified at the Doll arbitration hearings. He admitted that he was one of only two of the named individuals who were actually involved in the fund's hedging strategy. He further testified that neither he nor the second individual had any prior hedging experience whatsoever, and that he had derived his knowledge of hedging techniques exclusively from books and articles.

The appellants filed their demand for arbitration five months later on April 9, 2007. Their statement of claim asserted 16 separate counts, including fraudulent misrepresentation of hedging expertise. Subsequently, CSAM filed this CPLR article 75 petition seeking to stay or dismiss the arbitration proceeding on the grounds that the appellants' claims were time-barred.

Supreme Court agreed and dismissed all the appellants' claims as barred by the statute of limitations. (2008 NY Slip Op 30209[U].) The court cited to *Rostuca Holdings v Polo* (231 AD2d 402 [1st Dept 1996]), correctly noting that the statute of limitations period for fraud "is the longer of six years from the wrongful conduct or two years from when the party knew, or should have discovered, the fraud." (*Id*. at *6.) The court then found that the appellants were put on notice of the alleged fraud by the drastic losses evident at the end of 2002, and thus that they should have commenced the arbitration action within two years of that date.

The court relied on our determination in *Ghandour v Shearson Lehman Bros.* (213 AD2d 304 [1995], *lv denied* 86 NY2d 710 [1995]), in which we found that "the substantial losses sustained by the accounts under the circumstances . . . [were] sufficient to place plaintiffs on notice of the potential fraud."

(213 AD2d at 306.) The court thus concluded in the instant case that

> "the loss of such a drastic amount—over 90% of the [f]und's value—put the investors on notice of the potential fraud as of late 2002. Even if the investors did not have actual knowledge of the alleged fraud at that time, they were aware of the fact of the significant loss, from which fraud could be reasonably inferred. Thus since more than two years have passed since the investors could have discovered the alleged fraud, the statute of limitations has run and the fraud claim should be dismissed." (2008 NY Slip Op 30209[U] at *7.)

The court further found that the Hellers had actual notice of the alleged fraud by July 2001, as evidenced by the Heller letter, which charged the fund's managers with gross mismanagement.

On appeal, the appellants argue, first, that under the Federal Arbitration Act (hereinafter referred to as the FAA), the applicability of the statute of limitations is for the arbitrator, not the court, to determine. (*See* 9 USC § 2.) Second, they assert that Supreme Court erred in relying on *Ghandour*; that *Ghandour* does not stand for the proposition that a drastic decline in account values is inquiry notice of alleged fraud as a matter of law; and that even with reasonable diligence, they could not have discovered CSAM's fraudulent misrepresentation of its hedging expertise more than two years before the date they commenced arbitration proceedings. We agree with the appellants' latter assertions.

■ As a threshold matter, the applicability of the statute of limitations is properly a question for the court. The appellants correctly observe that their claims arise from a transaction in interstate commerce and, therefore, fall under the FAA. (9 USC § 2.) However, the FAA requires that courts respect the agreements of parties to arbitrate, including agreements as to what law governs the arbitration procedures. (*Volt Information Sciences, Inc. v Board of Trustees of Leland Stanford Junior Univ.*, 489 US 468, 475-476 [1989].) "A choice of law provision, which states that New York law shall govern both the agreement *and its enforcement*, adopts as binding New York's rule that threshold Statute of Limitations questions are for the courts." (*Matter of Diamond Waterproofing Sys., Inc. v 55 Liberty Owners Corp.*, 4 NY3d 247, 253 [2005] [internal quotation marks and citation omitted].) Because the subscription booklet contained such a

provision, we find that New York courts have authority to rule on the applicability of the statute of limitations. (CPLR 7502 [b].)

Although the appellants attempt to marshal federal precedent to support their contention that the statute of limitations is not a matter for the courts to resolve (*see e.g. Shearson Lehman Hutton, Inc. v Wagoner*, 944 F2d 114 [2d Cir 1991]), they are unable to point to any binding authority for their position.

Although Supreme Court was correct in considering the timeliness of the appellants' claims, it erred in interpreting *Ghandour* to stand for the proposition that a significant loss of value *automatically* puts investors on notice of fraud. In *Ghandour*, we limited the ruling to the unique circumstances of that case, which included evidence that the plaintiff had made the same investments as his brother, and that his brother had learned of the fraud and commenced a timely action six years earlier. (213 AD2d at 306.)[3] Indeed, in a subsequent ruling this Court held that even an investor's loss of "almost all of its investments" was insufficient to "disclose a sufficient basis for imputing a knowledge of the fraud." (*Saphir Intl., SA v UBS PaineWebber Inc.*, 25 AD3d 315, 316 [1st Dept 2006] [internal quotation marks and citation omitted].)

■ Moreover, under the circumstances of the instant case, knowledge of fraud cannot be imputed to the investors as a result of the losses they experienced. Even were we to assume that the appellants in this case are particularly sophisticated investors, the standard is an objective one based on a person of ordinary intelligence. (*Ghandour*, 213 AD2d at 305-306; *Watts v Exxon Corp.*, 188 AD2d 74, 76 [3d Dept 1993].) Here, the record reflects that the appellants were warned that the fund was particularly risky because it contained newly-emerging, high-technology dot-com stocks with little or no operating histories. This alone should defeat an assumption that the loss in value would necessarily cause a person of ordinary intelligence to infer fraud, rather than the obvious inference of high risk. Although the fund's hedging strategy was intended to protect investors' portfolios, the record reflects that the background materials sent to the appellants nevertheless underscored the

3. The dissent argues that the earlier claims brought against CSAM make this case indistinguishable from *Ghandour*. However, in *Ghandour* the plaintiff's claim was identical to that which his brother had already prevailed upon. In the instant case, the fraudulent misrepresentation of hedging expertise was not asserted by any party prior to 2006.

extremely risky nature of the appellants' investment. The record also reflects that the losses occurred during a significant downturn in the technology sector, further supporting a finding that at a time of widespread losses the appellants reasonably could have assumed that their losses were not necessarily the product of fraud.

Further, contrary to the findings of the court below, we do not find that the Heller letter could be considered evidence of actual knowledge of fraud. The letter did not allege any facts constituting fraud; rather, it simply proves the uncontested fact that the Hellers suspected mismanagement by CSAM. "[M]ere suspicion will not suffice as a ground for imputing knowledge of the fraud." (*K&E Trading & Shipping v Radmar Trading Corp.*, 174 AD2d 346, 347 [1st Dept 1991] [internal quotation marks and citations omitted].)

In fact, the exchange between the Hellers and Paolella demonstrates that the appellants could not have discovered the fraud through the exercise of reasonable diligence. The Heller letter sought an explanation for the losses the fund had experienced, satisfying the duty of inquiry even under Supreme Court's erroneous reading of *Ghandour*. In response to this inquiry, Paolella explained the rationale for the fund's actions and expressed a hope that the fund would recoup some of its losses moving forward. At the very least, the Paolella letter conveyed a representation that qualified people were acting purposefully in managing the fund. This provided no further grounds from which a reasonable person would necessarily infer fraud.

It is well settled that if a party " 'omits [an] inquiry *when it would have developed the truth*, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him.' " (*Prestandrea v Stein*, 262 AD2d 621, 622 [2d Dept 1999], quoting *Higgins v Crouse*, 147 NY 411, 416 [1895] [emphasis added].) This is not what happened here. Even though the losses continued through September 2002, the fact that the Paolella letter contained nonfraudulent explanations for the fund's actions suggests that reasonable diligence would not have revealed any evidence of fraud to the appellants at that time. (*See also M&A Oasis v MTM Assoc.*, 307 AD2d 872, 873 [1st Dept 2003] [claims not time-barred when "plaintiff had demanded information about (a) mortgage after becoming aware of its existence in late 1998, but defendants refused to provide such information until early 2000"].)

CSAM's assertion that arbitrations commenced by other investors provided notice of the fraud is also unpersuasive. The

respondents claim that the arbitrations begun by other investors in February 2003 (hereinafter referred to as the 2003 arbitration) and by investors Dixon and Carol Doll in May 2004 (hereinafter referred to as the Doll arbitration) started the statute of limitations running on the claims of fraudulent misrepresentation of hedging expertise. To trigger the statute of limitations, it must "conclusively appear that [the appellants] had knowledge of facts" from which fraud could be inferred. (*Trepuk v Frank*, 44 NY2d 723, 725 [1978].) Because there is no evidence in the record showing the appellants' contemporaneous knowledge of the Doll arbitration, it is immaterial to determining when the statute of limitations began to run.

However, the record reflects that the appellants were informed of the 2003 arbitration. The 2003 CFS alerted them that a proceeding had been initiated asserting "[c]laims for breach of contract, breach of fiduciary duty, misrepresentation, and gross negligence." There is no evidence that the appellants inquired further into the factual basis behind these allegations. Given that the appellants bear the burden of proof in showing that they exercised reasonable diligence, we find they were on notice that they may have been defrauded by misrepresentations of the fund's "active hedging strategy" upon receipt of the 2003 CFS. (*See Endervelt v Slade*, 214 AD2d 456, 457 [1st Dept 1995].)

Nonetheless, this was insufficient notice of the fraudulent misrepresentation of the fund directors' expertise. The exchange between the Hellers and Paolella focused exclusively on how the fund was carrying out its hedging strategy, and did not contemplate the possibility that it had misrepresented the qualifications or expertise of its directors. Neither of the two arbitrations commenced alleged fraudulent misrepresentation of hedging expertise. The 2003 arbitration was concluded without uncovering any evidence of this act of fraud. It was only following Neuburger's admissions that the Doll SOC was amended to reflect a new claim of fraud based on the facts he disclosed. Because one arbitration did not uncover this fraud at all, and another did not unearth the facts constituting the fraud until it reached the discovery stage, we do not find that reasonable diligence on behalf of nonparties to the arbitration could have revealed this fraud.

The respondents correctly observe that "[i]t is knowledge of facts not legal theories that commences the running of the two-year limitations period." (*TMG-II v Price Waterhouse & Co.*,

175 AD2d 21, 23 [1st Dept 1991], *lv denied* 79 NY2d 752 [1992].) In *TMG-II*, this Court held that when the plaintiffs had knowledge of facts suggesting fraud, the discovery of new information about the same fraudulent act did not toll the statute of limitations. (175 AD2d at 23.) In contrast, there was no information regarding the misrepresentation of the directors' hedging expertise prior to Neuburger's testimony. This is an entirely separate fraudulent act, and not merely an additional aspect of a previously alleged fraud.

Because even those parties who exhibited "reasonable diligence" and commenced arbitration proceedings did not learn of the fraudulent misrepresentation of the directors' expertise until November 7, 2006, it is apparent that the appellants could not have discovered this information prior to that date. Therefore, when they filed their demand for arbitration five months later on April 9, 2007, they were well within the two-year statute of limitations.

Accordingly, the order of the Supreme Court, New York County (Herman Cahn, J.), entered January 25, 2008, which granted the petition and dismissed the arbitration proceeding commenced by the respondents, should be reversed, on the law, with costs, the petition denied and the matter remanded for arbitration.

Tom, J.P. (dissenting). Appellants are investors who, between September 1999 and June 2000, contributed securities to DLJ Emerging Growth Partners, L.P., an exchange fund managed by respondent CSAM Capital, Inc., the fund's general partner. An exchange fund permits an investor to contribute a highly appreciated position in a single security in exchange for a limited partnership interest in the pool of securities contributed by all of the investors, with the result that each investor obtains immediate, tax-free diversification (since the contributions of stock are not subject to capital gains taxes).

While the fund initially performed well, in July 2001, two of the appellants wrote to complain that their investment had been "decimated" due to "gross mismanagement of the Fund." By September 2002, the fund had lost more than 90% of its original value.

In February 2003, one of the fund's limited partners, represented by the same counsel as appellants herein, brought an arbitration claim against CSAM Capital based on "a false representation . . . that the Fund's hedging strategy would

ensure that she did not lose more than 20% of her investment in the Fund." The investor eventually received an award of over $1 million.

In July 2004, another limiter partner, the Doll family trust fund, also represented by the same counsel, filed an arbitration claim alleging, inter alia, that respondents fraudulently induced it to invest in the fund by misrepresenting material facts upon which it relied to its detriment. Specifically, the statement of claim, dated July 23, 2004, alleged that respondents

> "sold the Fund to prospective investors by representing that the Fund would hedge the Fund to protect against downside risk, flatten short term volatility and prevent margin calls as a key investment strategy. Respondents knew when they made this representation, however, that . . . the Fund could not use hedging to provide any meaningful downside risk protection because of the large percentage of restricted stock in the Fund's portfolio. Similarly, the Fund could not use hedging to flatten short term volatility or prevent margin calls. These facts were not disclosed to the investors."

The Doll trust's claims alleging fraud in the inducement, misrepresentation as to the fund's active hedging strategy and breach of fiduciary duty as a result of the failure to hedge the fund were ultimately dismissed in an interim decision issued by the arbitration panel.

Appellants served a demand for arbitration in April 2007, alleging that they were fraudulently induced to invest in the fund due to respondents' misrepresentation of their hedging experience and expertise. The question dividing this Court is whether the arbitration proceedings were untimely brought, as Supreme Court decided, because they were commenced more than two years from the time appellants "could with reasonable diligence have discovered" the asserted fraud (CPLR 213 [8]).

Similar to the claim of the Doll family trust, appellants' statement of claim alleges that "to induce Claimants and other investors to invest in the Fund," respondents promised to "engage in an 'active hedging strategy' in the management of the Fund" and represented that "hedging decisions would be made by people with 'significant expertise in the design and use of sophisticated hedging techniques.' " Likewise, the Doll claim alleged that "[r]espondents fraudulently selected and held securities in the Fund based solely upon their own self-interest, with

the goal of increasing their own fees," while the claim filed by appellants herein alleges "inappropriate conduct for the purpose of generating commissions and fees . . . including their handling of the Fund's qualifying investments." In short, appellants' statement of claim does little more than restate the main allegations of the Doll family trust claim. Indeed, the Doll trust's 2004 arbitration proceeding explicitly questioned the "integrity, experience and skill of the Fund's managers" and alleged "fraud in the marketing and management" of the fund.

If other limited partners were aware, in 2003 and 2004, respectively, that the hedging strategies the fund promised to employ had been misrepresented, appellants, similarly situated limited partners, were also in a position to have known of the misrepresentation made as to the effectiveness of CSAM's hedging activities and the skill and experience of the fund's managers. Furthermore, it does not require a particularly astute observer to deduce that if a supposedly hedged trading position loses some 90% of its value, the hedging employed was acutely ineffective or completely nonexistent. Alternatively stated, the loss of more than 90% of the fund's value by September 2002, albeit during a volatile market, despite the promoted "active hedging strategy," placed the fund's investors on inquiry notice as to whether the purported hedging strategy was being pursued, as promised, by individuals possessing the requisite skill (see Rite Aid Corp. v Grass, 48 AD3d 363, 364 [2008]; Ghandour v Shearson Lehman Bros., 213 AD2d 304, 305-306 [1995], lv denied 86 NY2d 710 [1995]). The commencement of two timely arbitration proceedings by other investors, of which arbitrations appellants were aware, alleging fraudulent inducement as a result of the misrepresentation of hedging activities obviates the need to inquire whether the fund's investors had sufficient information to enable them to advance a contemporaneous fraudulent misrepresentation claim.

In view of these facts, this Court's decision in Ghandour is not readily distinguishable. Similarly, in Ghandour, the respondent claimants made the same investment as made by other limited partners who brought timely arbitration claims several years earlier. In sum, I agree with the majority to the extent that the loss of the bulk of an investment is merely one factor indicating that the claimant should have known of the alleged fraud; however, I strongly disagree that appellants lacked sufficient knowledge of the alleged fraud in connection with purported hedge positions by 2004 to have asserted a claim for

fraudulent inducement and to have been put on notice of that fraud by reason of the devastating losses sustained by the fund.

Appellants make much of the fact that proof of the fund's misrepresentation of its managers' hedging experience was not received until November 7, 2006—when Hugh Neuburger testified that none of the persons responsible for implementing the fund's hedging strategy had any experience in the design and use of sophisticated hedging techniques—with the result that the arbitration panel permitted the statement of claim to be amended to conform to the new evidence. It remains, however, that the Doll trust's original statement of claim alleged fraudulent inducement as a result of misrepresentation regarding the fund's use of hedging. Furthermore, the test of whether a claim for fraud has been timely pursued is measured from the time the claimant should have *discovered* the potential fraud, not the time at which the claimant has acquired actual *proof* that fraud was perpetrated (*see Erbe v Lincoln Rochester Trust Co.*, 3 NY2d 321, 326 [1957]). The claim advanced by the Doll trust in 2004 conclusively demonstrates that appellants "had knowledge of facts from which the fraud could reasonably be inferred" (*Trepuk v Frank*, 44 NY2d 723, 725 [1978]).

Accordingly, the order should be affirmed.

MAZZARELLI, NARDELLI and MOSKOWITZ, JJ., concur with CATTERSON, J.; TOM, J.P., dissents in a separate opinion.

Order, Supreme Court, New York County, entered January 25, 2008, reversed, on the law, with costs, the petition denied and the matter remanded for arbitration.