[48 NYS3d 98]

Norddeutsche Landesbank Girozentrale et al., Respondents-Appellants, v Lynn Tilton et al., Appellants-Respondents.

First Department, February 23, 2017

**APPEARANCES OF COUNSEL**

*Gibson, Dunn & Crutcher LLP*, New York City (*Caitlin J. Halligan, Randy M. Mastro, Lawrence J. Zweifach* and *Mark A. Kirsch* of counsel), for appellants-respondents.

*Berg & Androphy*, New York City (*Michael M. Fay, Jenny H. Kim* and *Chris L. Sprengle* of counsel), for respondents-appellants.

OPINION OF THE COURT

MAZZARELLI, J.P.

In January 2005, plaintiffs purchased $75 million of notes issued by the collateralized debt obligation (CDO) fund Zohar II 2005-1, Limited (Zohar II). In April 2007, plaintiffs purchased $60 million of notes issued by CDO fund Zohar III, Limited (Zohar III and, together with Zohar II, the Funds). Pursuant to collateral management agreements with the Funds, defendant Patriarch Partners, LLC (Patriarch LLC) was engaged to select and manage the collateral to be held by the Funds. Defendants Patriarch Partners XIV, LLC and Patriarch Partners XV, LLC are controlled by Patriarch LLC and defendant Lynn Tilton, and are the respective collateral managers of Zohar II and Zohar III. Tilton is the principal and controlling member of the Patriarch entities. At least as far as the indentures governing the Funds represented them to be, the Funds were ordinary CDOs, that is, they were supposed to hold debt obligations. Further, the Funds were "blind," meaning that investors like plaintiffs did not know the identities of the companies to whom the loans that made up the Funds were made (the Portfolio Companies).

In March, 2015, the Securities and Exchange Commission (SEC) commenced administrative and cease-and-desist proceedings against defendants (as well as against one other Zohar fund not involved in this litigation), alleging that Tilton and the Patriarch entities defrauded the Funds and their investors "by providing false and misleading information, and engaging in a deceptive scheme, practice and course of business, relating to the values they reported for these funds' assets." The order commencing the proceeding directed that cease-and-desist proceedings be commenced to determine whether their allegations were true, and whether remedial action was appropriate in the public interest.

According to plaintiffs, the SEC proceeding alerted them to the need to perform their own investigation into their investment in the Funds. They claim that, upon the completion of that investigation, they concluded that the Funds were not CDOs at all. Rather, plaintiffs contend that, unbeknownst to them because of deliberate concealment by defendants, the

Funds were de facto private equity funds. Plaintiffs claim to have discovered that defendants used the proceeds from Fund investors to obtain controlling positions in the Portfolio Companies, which turned out to be distressed and already at risk of failure. Further, they discovered that defendants purposely siphoned off the value in the Portfolio Companies to the point that they collapsed, including by taking excessive management fees for themselves, causing significant losses to plaintiffs and other investors. Less than two months after the SEC commenced its proceeding, plaintiffs commenced this action. Their complaint asserts two causes of action, for fraudulent misrepresentation and for negligent misrepresentation.

Defendants moved to dismiss the complaint pursuant to CPLR 3211 (a) (5) and (7). They argued that the claims are barred under the applicable six-year statute of limitations for fraud, because plaintiffs filed their complaint 10 years after they made their investments. They further argued that plaintiffs could not avail themselves of the fraud discovery toll, contending that they were on notice of their claims as early as 2009, based on numerous disclosures made to them by defendants over a lengthy period of time that should have alerted plaintiffs that the Funds were not garden-variety CDOs. These disclosures included the indentures governing the issuance of the Funds. Defendants pointed out that the Zohar II indenture detailed CDOs to be acquired by Zohar II from another fund, and that with respect to 23 out of the 27 borrowers listed therein, the other fund "owns equity interests in each such borrower, which equity interests . . . are also being transferred to [Zohar II]."

Defendants also directed the court to certain marketing materials released by them in February 2007 with respect to the Funds, known as the "Patriarch Presentation." The Patriarch Presentation disclosed that "[o]n January 13, 2005, Patriarch closed a $1.1 billion CDO, Zohar II, Limited, in order to purchase companies and originate loan assets to companies undergoing pervasive change." The Patriarch Presentation further showed Zohar II's projected equity interest in various Portfolio Companies. Zohar's projected equity interest in several of the companies was shown as 100%, and its interest in various other companies was reflected as high as between 80% and about 96%. The Patriarch Presentation also disclosed Zohar III's projected equity interests in various entities of up to 40%. Defendants assert that, in total, the Patriarch Presenta-

tion disclosed that the Funds' combined equity interests exceeded 50% for 23 Portfolio Companies, and amounted to a 100% interest in seven Portfolio Companies.

The Patriarch Presentation further disclosed that the Funds' investment strategies included "[p]urchasing power to acquire companies by way of myriad sales processes including direct negotiations and acquisitions, Section 363 sales (in Bankruptcy) and Article 9 foreclosure sales (under the Uniform Commercial Code) with the subsequent re-levering of capital structures to meet such companies' and the Zohar funds' debt-financing requirements." In addition, it provided that "the Zohar asset yield is a product of a high yield current coupon combined with added loan accretion, preferred equity and common equity interests . . . the enhanced quality of the assets reduces the default probability of the portfolio and renders the added preferred loan and equity returns, in most cases, highly collectable."

Defendants also relied on the transcript of a December 12, 2011 Zohar III investor call, in which plaintiffs participated and in which they declined an opportunity to ask questions. The purpose of the call was for Tilton to discuss Zohar III's performance with investors and to allow investors to ask Tilton any questions. Tilton explained that

> "[the Funds] were raised to buy the loans and the equity of distressed companies. And when I say the equity, not buy the equity, but we agreed to contribute the equity of the companies that we purchased into these deals in whole or in part. And most of the time when the equity was purchased, it was purchased with my own money . . . these funds are completely dependent upon the upside potential [i.e., growth] of these companies, which is one of the reasons that we agreed to do that, because we buy very distressed companies, either in Article 9 foreclosure sales or through bankruptcy 363 sale or through asset sales, and the theory is always taking that long journey of rebuilding companies and creating values. And so the feeling for us would be that if you were only putting the loans and not the upside in, that, in my view, it would be taking a lot of risk without sharing the reward. And so these deals were always set up such that we would go out and we would buy these companies, the loans

would be made from these funds, sometimes also with asset-based loans above them or have been used to replace them, and then a percentage of the equity would be contributed into these funds."

Tilton cautioned that

"it's really important to understand that this is not like in any way typical CDOs, where you're owning pieces of publically traded loans where you can exit at a price. This is [illiquid] [i.e., higher risk]. We need to actually create value in the companies and then we need to exit the value in the companies. That said, most CDOs also don't hold the equity value of the companies you don't see that anywhere."

In arguing that plaintiffs had sufficient information to at least begin an inquiry into the true nature of the CDOs well before the commencement of the SEC proceeding, defendants further relied on a publicly available SEC disclosure released by them in February 2012. That disclosure revealed that Patriarch Partners "primarily invests on behalf of its CDO Clients in undervalued, distressed companies or divisions and other assets thereof" and often "seeks to make opportunistic investments on behalf of its CDO Clients with the primary purpose of obtaining influence over or control of financially troubled companies, focusing on 'turning around' these Assets by restoring their value." The filing contained the following several disclosures about the Funds' equity positions in Portfolio Companies, and the risks inherent therein. For example, it stated that

"affiliates of the Investment Advisor often may take an equity position in these same companies. Despite being under no legal obligation to do so, these affiliates often transfer to CDO Clients the equity ownership of Assets in which the CDO Clients invest, thereby increasing the potential for returns on such Assets beyond the investments made by the CDO Clients. No credit is given to this equity ownership by the rating agencies and the value of this equity ownership is not used in fee calculations . . . This equity ownership also provides an additional potential source of funds."

Finally, defendants cited publicly available court documents, from as early as November 2009 that alleged that the Funds

acquired substantial equity stakes in the Portfolio Companies. Defendants also moved to dismiss the two causes of action for failure to state a claim.

The court granted defendants' motion, but only to the extent of dismissing the negligent misrepresentation claim for failure to state a cause of action. Addressing the statute of limitations argument, the court held that plaintiffs were not on notice of their claims until the SEC issued its order in March 2015, and that the Funds' underperformance and downgrades by Moody's, and the disclosures provided by defendants, raised no more than a mere suspicion of fraud, which the court stated is legally insufficient to put plaintiffs on notice. The court concluded that plaintiffs did not omit a possible inquiry or shut their eyes to facts which called for investigation, noting that defendants had exclusive access to the information from which plaintiffs could have inferred a fraud. Thus, the court concluded that knowledge of the alleged fraud could not be imputed to plaintiffs, and the claims are not time-barred.

The court further found that the complaint sufficiently alleged misrepresentations in the offering documents and marketing materials provided by defendants upon which plaintiffs reasonably relied, that defendants acted deliberately and that plaintiffs suffered damages. The court, therefore, denied the motion to dismiss the fraudulent misrepresentation cause of action. However, the court dismissed the cause of action for negligent misrepresentation after finding that plaintiffs had alleged only an arm's length relationship and no special relationship of trust.

> "On a motion to dismiss a cause of action pursuant to CPLR 3211 (a) (5) on the ground that it is barred by the statute of limitations, a defendant bears the initial burden of establishing, prima facie, that the time in which to sue has expired. In considering the motion, a court must take the allegations in the complaint as true and resolve all inferences in favor of the plaintiff. Further, plaintiff's submissions in response to the motion must be given their most favorable intendment" (*Benn v Benn*, 82 AD3d 548, 548 [1st Dept 2011] [internal quotation marks and citations omitted]).

Here, it is undisputed that, when plaintiffs commenced the action, six years had passed since plaintiffs made their investments in the Funds. The question, then, is whether plaintiffs

discovered, or could with reasonable diligence have discovered, the fraud more than two years before commencement (CPLR 213 [8]).

"The inquiry as to whether a plaintiff could, with reasonable diligence, have discovered the fraud turns on whether the plaintiff was possessed of knowledge of facts from which [the fraud] could be reasonably inferred. Generally, knowledge of the fraudulent act is required and mere suspicion will not constitute a sufficient substitute. Where it does not conclusively appear that a plaintiff had knowledge of facts from which the fraud could reasonably be inferred, a complaint should not be dismissed on motion and the question should be left to the trier of the facts" (*Sargiss v Magarelli*, 12 NY3d 527, 532 [2009] [internal quotation marks and citations omitted]).

At the same time, "[i]t is well settled that if a party omits [an] inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him" (*CSAM Capital, Inc. v Lauder*, 67 AD3d 149, 156 [1st Dept 2009] [internal quotation marks and emphasis omitted]). Loss alone, however, cannot give rise to such a duty to inquire (*id.* at 155).

■ Defendants maintain that plaintiffs should have inferred the existence of the fraudulent scheme they allege as early as 2009, based on the various documents and events they present in support of their motion. Plaintiffs counter that the "clues" defendants contend they should have picked up were insufficient for them to establish the crux of their complaint, which is that the Funds were not CDOs, but rather a method by which defendants could use borrowed money to enrich themselves by plundering the Portfolio Companies. Giving to plaintiffs, as we must, the most favorable interpretation of defendants' evidence, we find that plaintiffs had insufficient facts before the SEC proceeding to plead their causes of action.

For example, the Zohar II indenture may have alerted plaintiffs to the fact that a fund that was an affiliate of defendants had transferred equity into the Zohar II fund. However, the existence of equity in the Funds was not something that should have surprised plaintiffs. In fact, the indenture provided that the Funds were permitted to hold equity "kickers" (equity offered by a borrowing company to entice it to lend in the first

place), or equity given the lender in a workout of an underperforming loan. As for the Patriarch Presentation, there is nothing defendants can point to that would have alerted plaintiffs that, contrary to the purpose for which the Funds were marketed, defendants intended to immediately use their investment as a vehicle to acquire companies wholesale for their own benefit. That the Patriarch Presentation included schedules depicting a potential scenario where the Funds had substantial equity in some of the Portfolio Companies does not change that analysis, especially where plaintiffs understood that the Funds could hold equity that was acquired incidentally. Simply put, the Patriarch Presentation does not offer any hint that, as plaintiffs allege, the raison d'être for the Funds was to acquire equity.

The investor call also fails as evidence that plaintiffs were aware of the fraud immediately after it occurred. There is no question that Tilton opined in the call that the CDOs at issue were not typical. However, this is far different than a statement consistent with plaintiffs' theory of the case, or even a hint that defendants had misrepresented the nature of the Funds before plaintiffs invested in them. Indeed, some of Tilton's statements in the call are completely at odds with the scheme that plaintiffs allege in their complaint. Again, plaintiffs allege that defendants used *the Funds* to purchase large equity stakes in the Portfolio Companies. Tilton asserted in the investor call that "these deals [i.e., the Funds] were raised to buy the loans and the equity of distressed companies. And when I say the equity, not buy the equity, but we agreed to contribute the equity of the companies that we purchased into these deals in whole or in part." Plaintiffs maintain that, in referring to "we," Tilton was talking about Patriarch Partners, not the Funds. As noted above, in the present procedural posture, plaintiffs are entitled to the most advantageous reasonable interpretation of the evidence.

The SEC filings similarly offer no direct link to the fraud accusations ultimately leveled by plaintiffs. Those documents disclose that "affiliates" of Patriarch Partners may purchase equity positions in the Portfolio Companies. They do not state, as plaintiffs allege, that they would not be using their own money to do so, but rather would be using the Funds themselves to make those investments. Nor do they suggest that the equity stakes the Funds may obtain would be as a result of the alleged fraud, as opposed to the permitted acquisition of equity

through kickers, workouts and other mechanisms anticipated in the indentures. Even if the court documents were sufficient to place plaintiffs on notice of the alleged fraud, we are aware of no authority placing the onus on an investor to monitor all court proceedings concerning its investments, especially where there is otherwise no "wealth of public information that should have put it on inquiry notice of the alleged fraud" (*Aozora Bank, Ltd. v Deutsche Bank Sec. Inc.*, 137 AD3d 685, 689 [1st Dept 2016]).

The cases on which the dissent relies do not compel a different result. For example, in *K-Bay Plaza, LLC v Kmart Corp.* (132 AD3d 584 [1st Dept 2015]), evidence that a commercial tenant had deliberately altered pages in the lease so as to reduce escalated rent payments was directly available to the landlord's accountant more than two years before the landlord commenced suit, in the form of a discrepancy the accountant discovered between what the landlord expected to be paid and what the tenant claimed was due under the altered lease. Similarly, in *Gutkin v Siegal* (85 AD3d 687 [1st Dept 2011]), the plaintiff claimed that the defendants had represented that oil and gas drilling partnerships he invested in would receive 60% of net drilling revenue, but within one year of his investment he began receiving quarterly drilling reports that showed the amount of revenues the partnerships were receiving was significantly less than 60%. In both cases, the plaintiffs received information that was completely at odds with what they claimed was their reasonable expectation, and triggered a duty to inquire. Here, in contrast, plaintiffs have adequately established that evidence offered by defendants in support of their motion is not necessarily inconsistent with plaintiffs' expectations that the Funds could acquire equity, and that in no unambiguous way did that evidence reveal that defendants were using the Funds for the unexpected and deliberate purpose of acquiring controlling interests in companies in the style of a private equity fund.

Again, we make no conclusive finding that plaintiffs were blind to the scheme they accuse defendants of perpetrating. We merely determine, at this early stage of the litigation, that the evidence presented by defendants can be interpreted in a myriad of ways and does not facially clash with plaintiffs' position that, even having some knowledge that the Funds had an equity component to them, they could not have known before the SEC proceeding the extent to which defendants used

plaintiffs' investment to acquire and control the Portfolio Companies, or otherwise had an obligation, based on that evidence, to further investigate. Thus, Supreme Court properly declined to dismiss the fraudulent misrepresentation complaint on statute of limitations grounds, and the viability of the defense must await a fully developed factual record, at which point it can be either decided as a matter of law on a motion for summary judgment, or at a trial.

■ Further, Supreme Court properly held that plaintiffs had sufficiently alleged the elements of a cause of action for fraudulent misrepresentation. Such a claim is stated when a plaintiff pleads a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages flowing therefrom (*see Eurycleia Partners, LP v Seward & Kissel, LLP*, 12 NY3d 553, 559 [2009]). Further, it must be pleaded with particularity (*id.*; CPLR 3016 [b]). Plaintiffs stated a claim for fraud based on specific allegations that defendants knowingly misrepresented the performance of the loans, and their intent to rebuild and sell the Portfolio Companies; that defendants intended to induce plaintiffs to invest, and maintain their investment, in the Funds; that plaintiffs justifiably relied on defendants' misrepresentations, of which they either had no notice or could not have discovered; and that they lost $45 million on their investment. Defendants' alleged present intention not to perform under the terms of the indentures at the time of plaintiffs' initial investment negates defendants' argument that the fraud claim is merely duplicative of one for breach of contract (*see Mañas v VMS Assoc., LLC*, 53 AD3d 451, 453-454 [1st Dept 2008]).

■ Finally, the negligent misrepresentation claim was correctly dismissed, since plaintiffs failed to allege a special relationship of trust or confidence between the parties to this arm's length transaction (*see Basis Pac-Rim Opportunity Fund [Master] v TCW Asset Mgt. Co.*, 124 AD3d 538 [1st Dept 2015]).

Accordingly, the order of the Supreme Court, New York County (Eileen Bransten, J.), entered March 17, 2016, which granted the part of defendants' motion seeking to dismiss the negligent misrepresentation claim and denied the part of the motion seeking to dismiss the fraudulent misrepresentation claim, should be affirmed, with costs.

ANDRIAS J. (dissenting in part). In January and February 2005, plaintiffs, a commercial paper conduit and its administrator, purchased $75 million of notes issued by Zohar II 2005-1, Limited (Zohar II), a collateralized debt obligation (CDO) fund sponsored and managed by defendants. In April 2007, plaintiffs purchased $60 million of notes issued by defendants' Zohar III, Limited CDO fund (Zohar III, and, together with Zohar II, the Funds). The terms of the investments were outlined in deal documents, including indenture agreements.

In May 2015, plaintiffs filed this action against defendants asserting causes of action for fraudulent misrepresentation and concealment, and negligent misrepresentation. Plaintiffs allege that defendants fraudulently induced them to invest in the Funds by making numerous misrepresentations about their purpose, operation and management, and by concealing numerous risks, including their intent to use plaintiffs' investments to acquire substantial equity interests in the portfolio companies and to manage the Funds for their own benefit and profit.

We all agree that the negligent misrepresentation claim was correctly dismissed because plaintiffs failed to allege a special relationship of trust or confidence between the parties to this arm's length transaction. However, I disagree with the majority's conclusion that the motion to dismiss plaintiffs' fraudulent misrepresentation claim as time-barred was correctly denied because the evidence presented by defendants does not disprove plaintiffs' claim that they could not have known the extent to which their investments were being used to purchase equity interests in the portfolio companies until the Securities and Exchange Commission (SEC) commenced its proceeding against defendants in 2015. Rather, defendants conclusively established that, more than two years before the commencement of the action, plaintiffs were provided with notice that the funds at issue were not typical CDOs and included the widespread acquisition of controlling equity interests in the portfolio companies, which gave plaintiffs an adequate basis, with due inquiry, to discover the alleged fraud (*see Aozora Bank, Ltd. v Deutsche Bank Sec. Inc.*, 137 AD3d 685 [1st Dept 2016]). Accordingly, I dissent in part and would dismiss plaintiffs' fraudulent misrepresentation claims.

The statute of limitations for fraudulent inducement is six years from the time of the fraud or within two years from the time the fraud was discovered or, with reasonable diligence, could have been discovered (CPLR 213 [8]; *Sargiss v Magarelli*, 12 NY3d 527, 532 [2009]). While plaintiffs commenced this ac-

tion more than six years after the fraud claim accrued, i.e., when they purchased the notes (*Prichard v 164 Ludlow Corp.*, 49 AD3d 408 [1st Dept 2008]), they assert that the action is timely under the two-years-from-discovery rule because the monthly reports from defendants never revealed the Funds' equity positions and they were not put on notice of defendants' alleged fraud until on or about March 30, 2015, when the SEC issued an order commencing administrative cease-and-desist proceedings against defendants.\*

"The inquiry as to whether a plaintiff could, with reasonable diligence, have discovered the fraud turns on whether the plaintiff was possessed of knowledge of facts from which [the fraud] could be reasonably inferred" (*Sargiss*, 12 NY3d at 532 [internal quotation marks omitted]). "[K]nowledge of the fraudulent act is required and mere suspicion will not constitute a sufficient substitute" (*id.* [internal quotation marks omitted]). However,

> "where the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him" *Gutkin v Siegal*, 85 AD3d 687, 688 [1st Dept 2011] [internal quotation marks omitted]; *see also CIFG Assur. N. Am., Inc. v Credit Suisse Sec. [USA] LLC*, 128 AD3d 607, 608 [1st Dept 2015] ["Because plaintiff possessed information suggesting the probability that it had been defrauded, and failed to conduct an inquiry at that time, knowledge of the fraud is imputed"], *lv denied* 27 NY3d 906 [2016]).

On a motion to dismiss,

> "[d]efendants must make a prima facie showing that [the plaintiff] was on such inquiry notice of [their] fraud claims more than two years before the action was commenced. The burden then shifts to

---

\* In those proceedings, the SEC alleged that defendants had defrauded the Funds and the investors since 2003 by reporting misleading values for the assets held by the Funds and by failing to disclose a conflict of interest arising from the undisclosed approach to categorization of assets by defendant Lynn Tilton, the principal and controlling member of the Patriarch entities defendants.

[the plaintiff] to establish that even if it had exercised reasonable diligence, it could not have discovered the basis for its fraud claims" (*Aozora Bank, Ltd. v Credit Suisse Group*, 144 AD3d 437, 438 [1st Dept 2016]).

The crux of plaintiffs' complaint is their allegation that defendants falsely represented that the Funds would be operated as typical CDOs, which acquire or originate portfolios of corporate debt, but instead operated them as incredibly risky private equity ventures, using Fund proceeds to finance leveraged buyouts of controlling stakes in distressed companies. Plaintiffs assert that defendants then made loans to the companies, which hampered their operations and ability to pay debts as they came due, and retained them in order to perpetuate their role as collateral manager so that they could extract millions of dollars in excessive fees from the Funds.

The majority concludes that until the SEC proceeding was commenced in March 2015, plaintiffs had insufficient facts to plead these claims. At the heart of this finding is the majority's belief that plaintiffs' knowledge of the existence of some equity holdings in the Funds was not something that warranted further inquiry because the Funds were permitted to hold incidental equity interests, such as "equity kickers," and that the evidence presented by defendants, which can be interpreted in a myriad of ways, was not enough to alert plaintiffs to the true nature of the Funds.

However, the Zohar II Indenture disclosed in 2005 that Zohar II, at its inception, would purchase equity interests in 24 portfolio companies from another fund of the Patriarch defendants. A February 2007 Patriarch presentation, which plaintiffs received, stated that Zohar II was created "in order to purchase companies," that it focused on the "[a]cquisition of companies during periods of transition," and that the Zohar Funds provide "[p]urchasing power to acquire companies." The presentation also disclosed that the Funds had acquired or were going to acquire equity interests in 37 portfolio companies, including majority stakes in 23, and 100% stakes in seven.

Furthermore, in a December 12, 2011 investor call relating to Zohar III, in which plaintiffs participated, Tilton told plaintiffs that it was "really important to understand" that the Funds were "not like in any way typical CDOs," that the Funds "will be made and broken by the ultimate value of the companies, which truly includes all the equity value in these

companies, and that you're never going to see until these companies are sold and the cash has come in," and that the monthly reports provided to investors did not include the equity interests held by the Funds. The transcript of the call also shows that plaintiffs were aware that Zohar III's equity holdings were not subject to the various quality tests mandated in the Fund documents and that investors were told that "[t]he only thing we can do is continue to manage these deals for cash, for the cash test, and to try to increase the value of the underlying companies, such that when we sell them, they'll be a huge benefit to the value of the equity which you don't see." While the call was for Zohar III, it also put plaintiffs on inquiry notice with respect to their investment in Zohar II, since much of Tilton's discussion was directed to the Funds generally and since the investment strategies for both Funds appear to be substantially similar.

Thereafter, in 2012, Patriarch publicly filed a Form ADV with the SEC which disclosed that "[o]ften, [Patriarch] seeks to make opportunistic investments on behalf of its CDO clients with the primary purpose of obtaining influence over or control of financially-troubled companies, focusing on 'turning around' these Assets by restoring their value . . . ." Numerous filings in unrelated lawsuits, bought between 2009 and 2011, also referred to the Funds' direct acquisition of equity interests in portfolio companies. Moreover, plaintiffs knew that the Funds were underperforming when Moody's downgraded them twice before February 2011 and the S&P downgraded the CDOs in 2010.

This satisfied defendants' burden of establishing prima facie that plaintiffs were on inquiry notice of their fraud claims more than two years before the action was commenced in May 2015.

Noting that the investments were marketed as blind funds that did not identify the portfolio companies, plaintiffs argue that since defendants controlled all of the information that was produced in the monthly reports, no investors could have discovered the fraud until the SEC revealed the details of its investigation on March 30, 2015. In this regard, plaintiffs maintain that the disclosures defendants point to, at most, created a mere suspicion of fraud, which is insufficient to impute knowledge of the fraud (see CSAM Capital, Inc. v Lauder, 67 AD3d 149, 156 [1st Dept 2009]). Plaintiffs reason that while investors were told that there could be "equity kickers," which

plaintiffs describe as a "small piece of equity granted to a lender in order to improve the rate of return or otherwise incentivize the lender to take on the risk of lending," defendants did not disclose that their investments would be used to purchase controlling equity interests. Thus, plaintiffs posit that it was not until the SEC made public its investigation that they were prompted to conduct their own investigation in which they learned that defendants were operating a risky private equity venture that they were using to generate excessive management fees.

While the majority adopts these arguments, defendants' evidentiary submissions, viewed as a whole, are not consistent with plaintiffs' understanding that the Funds would only receive equity that was "acquired incidentally." Rather, they show that an integral purpose of the Funds was to acquire majority stakes in portfolio companies. While plaintiffs contend that only the possibility of equity kickers was disclosed, the evidentiary materials demonstrate that the Funds were "anything but typical [CDOs], for better or for worse" and had or would obtain majority or 100% stakes in many portfolio companies, putting plaintiffs on notice that the Funds were or would be operating far differently from what they purportedly believed, and that recovering on their investment would depend, at least in part, on "the sale of [the Portfolio] Companies" (*see K-Bay Plaza, LLC v Kmart Corp.*, 132 AD3d 584, 590 [1st Dept 2015] [the plaintiff was on inquiry notice due to discrepancy between expected proceeds and proceeds actually received]; *see also Gutkin*, 85 AD3d at 688 [the plaintiff "had constructive knowledge of the alleged fraud" from quarterly reports that did not reflect the plaintiff's understanding of the terms of the agreement]). Moreover, none of the disclosures relied on by defendants, which show that the Funds were acquiring controlling interests in portfolio companies, was in defendants' unique possession and plaintiffs have not shown how the existence of a blind trust prevented plaintiffs' from discovering the alleged fraud had they exercised due diligence.

Insofar as plaintiffs argue that the equity holdings were concealed because they were not disclosed in the monthly reports, they fail to consider Tilton's disclosure in the 2011 investor call that the reports did not include the equity interests held by the Funds. This too should have prompted plaintiffs to ask questions, which they did not do despite Tilton's invitation to do so at the conclusion of the call. Nor do plaintiffs offer a vi-

able explanation as to why the disclosures in the ADV filing and other court actions did not give them "notice of operative facts that should have prompted further inquiry" (*see Rite Aid Corp. v Grass*, 48 AD3d 363, 364 [1st Dept 2008]). To the extent plaintiffs argue that knowledge should not be imputed because they did not have actual notice of the ADV filing or the unrelated court actions, inquiry notice is established where the relevant information was publicly available; there is no requirement of a showing that a plaintiff actually knew the information (*see Aozora Bank, Ltd. v Deutsche Bank Sec. Inc.*, 137 AD3d at 689 ["there was a wealth of public information that should have put (the plaintiff) on inquiry notice of the alleged fraud"]; *CIFG Assur. N. Am., Inc. v Credit Suisse Sec. [USA] LLC*, 128 AD3d at 608).

Plaintiffs' intimation that they were not on notice of defendants' alleged intent not to rebuild the distressed portfolio companies, but to operate them for the primary purpose of continuing to receive management fees or their alleged misleading of investors about the performance of loans so as to extract excessive management fees, does not provide a basis to sustain the fraud claim to that extent. Unlike *CSAM Capital, Inc. v Lauder*, this claim is "merely an additional aspect of a previously alleged fraud" and not "an entirely separate fraudulent act" (67 AD3d at 158). Plaintiffs do not dispute that defendants were entitled to collateral management fees from the Funds or management fees for their role in managing the portfolio companies. The fraud alleged is that defendants misled plaintiffs to believe that the Funds were ordinary CDOs that would primarily hold debt, not equity, and the excessive fees flowed from the acquisition and management of the portfolio companies. Furthermore, unlike the plaintiffs in *CSAM*, plaintiffs' investigation was not impeded by "nonfraudulent explanations" (67 AD3d at 156).

In sum, viewing the wealth of information disclosed and available to plaintiffs, a person of ordinary intelligence would have been aware that the Funds were not being operated as typical CDOs and that they were acquiring substantial equity interests in the portfolio companies, not incidental interests in limited circumstances. As the wrongful acquisition of equity interests is the basis of plaintiffs' fraud claim, a duty of inquiry on this topic arose more than two years before the commencement of this action, which plaintiffs did not satisfy. Thus, defendants' motion to dismiss the fraudulent misrepresentation claim should have been granted.

FEINMAN and GISCHE, JJ., concur with MAZZARELLI, J.P.; AN-DRIAS and SAXE, JJ., dissent in part in an opinion by ANDRIAS, J.

Order, Supreme Court, New York County, entered March 17, 2016, affirmed, with costs.